UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.                        No.  1:20-cr-24

MUSTAFA DEVILLE REYNOLDS,        HON. PAUL L. MALONEY
    also known as "J,"             United States District Judge

        Defendant.

_____/

## GOVERNMENT'S TRIAL BRIEF

In the early morning hours of August 21, 2019, Grand Rapids Police officers responded to two drug overdoses within a three-hour period: at approximately 2:45 a.m., A.M.'s roommate called 911 after finding A.M. unresponsive in his car parked in the driveway; and at approximately 5:21 a.m., B.D.'s roommate called 911 after finding B.D. unresponsive in his bedroom. The defendant, Mustafa Deville Reynolds, also known as "J," distributed the deadly heroin/fentanyl mixture that caused A.M. and B.D.'s deaths. A week later, Reynolds sold a heroin/fentanyl mixture to an undercover police officer. Reynolds used the phone found on his person that day to facilitate the drug deals with the officer, with A.M., and with B.D.'s middleman, Dan Errico. Witness testimony, historical location data, phone tolls, and text messages prove that Reynolds sold the deadly heroin/fentanyl mixture directly to A.M. and indirectly to B.D. through a middleman, Dan Errico. Expert testimony from medical doctors proves that the heroin/fentanyl mixture caused both A.M. and B.D.'s deaths.

## I. ELEMENTS OF THE CHARGED OFFENSES

On August 4, 2020, a federal grand jury returned a superseding indictment charging the defendant with three crimes: (1) distribution of heroin/fentanyl on August 20, 2019 resulting in the death of A.M.; (2) distribution of heroin/fentanyl on August 20, 2019 resulting in the death of B.D.; and (3) distribution of heroin/fentanyl on August 27, 2019 (the sale to the undercover officer), all in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C).

A. <u>Distribution of Heroin/Fentanyl Resulting in Death (Counts One and Two)</u>

Distribution of a controlled substance resulting in death has three elements: (1) the defendant knowingly or intentionally distributed heroin and fentanyl; (2) the defendant knew at the time of distribution that the substance was a controlled substance; and (3) that A.M. (count one) and B.D. (count two) would not have died but for the use of that same heroin and fentanyl distributed by the defendant. Sixth Circuit, Pattern Criminal Jury Instruction 14.02B (March 21, 2021); *Burrage v. United States*, 571 U.S. 204 (2014); *United States v. Volkman*, 797 F.3d 377 (6th Cir. 2015). The Sixth Circuit approved this jury instruction in *Volkman* and has subsequently recognized the two causation standards discussed by the Supreme Court in *Burrage*: "but-for" and "independently sufficient" causation. *See* Instruction 14.02B commentary (current through March 21, 2021).

The first causation standard, the "but-for" standard, was adopted by the Sixth Circuit and appears in paragraph (1)(C) of the instruction. *See Burrage*, 571 U.S. at 209-213. Discussing this but-for standard, the Sixth Circuit has explained:

> The Government was not required to prove, however, that oxycodone was [the victim]'s *only* cause of death. On the contrary, but-for causation exists where a particular controlled substance—here, oxycodone— "combines with other factors"—here, *inter alia*, diazepam and alprazolam—to result in death. *Burrage*, 517 U.S. at 211. The Government presented sufficient oxycodone-specific evidence for a rational jury to find that, "without the incremental effect" of the oxycodone, [the victim] would not have died. *Id.*

*Volkman*, 797 F.3d at 395.

The second causation standard the Supreme Court mentioned in *Burrage* is that the victim's use of the drug distributed by the defendant was an "independently sufficient" cause of the victim's death. *Burrage*, 571 U.S. at 215, 218. Panels of the Sixth Circuit have applied this "independently sufficient" causation standard even though the Supreme Court did not accept or reject it in *Burrage. See United States v. Allen*, 761 F. App'x 447, 450-51 (6th Cir. 2017); *United States v. Ewing*, 749 F. App'x 317, 327-28 (6th Cir. 2018) (concluding the government presented sufficient evidence to support causation "either as an independent and sufficient cause or as a but-for cause."). Here, depending on the evidence admitted at trial, one or both of these causation instructions may be appropriate, even though the newly-minted Sixth Circuit pattern instruction only contemplates "but-for" causation.

The government need not prove that the death was foreseeable to the defendant. *See* § 14.02B at (2)(C). Distribution of heroin and fentanyl that does not result in death is a lesser-included offense. *See Burrage*, 571 U.S. at 210 n.3.

B.    <u>Distribution of Heroin and Fentanyl (Count Three)</u>

Distribution of heroin, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance, has two elements: (1) the defendant knowingly or

intentionally distributed heroin and fentanyl; and (2) the defendant knew at the time of distribution that the substance was a controlled substance. Sixth Circuit, Pattern Criminal Jury Instruction 14.02A (March 21, 2021).

## II. EVIDENTIARY ISSUES

### A. <u>The government will call expert witnesses.</u>

First, the government expects to call Kent County Medical Examiner Dr. David Start as an expert in forensic pathology. Dr. Start will testify about the autopsy he performed on A.M., his pathological findings during the autopsy, and will likely opine on the cause of A.M.'s death: acute fentanyl toxicity. Dr. Start will also testify about his review of B.D.'s blood toxicology report. No autopsy was performed on B.D.

Second, the government expects to call Dr. Bryan Judge as an expert in medical/forensic toxicology. Dr. Judge is not a fact witness, as he was not involved in the underlying investigation of this case. Instead, Dr. Judge will testify about his review of materials that were pertinent to the deaths of A.M. and B.D., and opine that heroin/fentanyl use was the cause of their deaths. The government produced Dr. Judge's report containing his conclusions to the defendant on April 16, 2021.

Third, the government expects to call DEA Special Agent Christopher Watkins, who will testify as an expert in drug trafficking. The Sixth Circuit has found that DEA special agents may testify as opinion witnesses about aspects of the drug trade because such topics are not within the province of the average juror. *See, e.g. United States v. Whyte*, 795 F. App'x 353, 360 – 61 (6th Cir. 2019) ("[T]he district court did not abuse its discretion in allowing Agent Burns to testify about various aspects of

the heroin and marijuana trade, and to then interpret the following 'drug trafficking jargon' for the jury's benefit."); *United States v. Leasure*, 331 F. App'x 370, 374 – 75 (6th Cir. 2009) (affirming admission of DEA agent's expert testimony and collecting cases).

Special Agent Watkins has worked for the DEA for more than 20 years. He is currently assigned to the Grand Rapids office where he is involved in investigations involving illegal manufacturing, distribution, transportation, and sales of controlled substances. Special Agent Watkins has been involved in hundreds of investigations while with the DEA, and he has attended numerous drug trafficking training courses, including DEA Basic Agent Training, Clandestine Laboratories Investigations, Advance Highway Criminal Interdiction, Telephone Exploitation, and others. The government anticipates that Special Agent Watkins will testify about how fentanyl, or heroin laced with fentanyl, is passed off as heroin, the behavior of typical fentanyl/heroin users, and the extent to which drug traffickers lack reliable quality control. Special Agent Watkins will likely also testify concerning the nature of street-level drug dealing, and slang terms used in drug dealing. Special Agent Watkins was not involved in the investigation of the defendant's charged offenses.

In the absence of stipulations regarding the identity of the heroin and fentanyl the defendant sold to an undercover police officer, the government will call forensic scientist Keith Szyniszewski, who works for the Michigan State Police forensic laboratory, and will testify consistently with his October 1, 2019 laboratory report that identified the substance from the undercover buy as heroin and fentanyl.

The government disclosed the identities of all experts and a summary of their proposed testimony to defense counsel on April 22, 2021.

The parties are also working on stipulations regarding the accuracy of the extractions that were done from cell phones during the investigation using Cellebrite software. Regardless, the process of cell phone extraction by law enforcement does not require expertise as defined under Rule 702. *See United States v. Seugasala*, 702 F. App'x 572, 575 (9th Cir. 2017) ("The officers who followed the software prompts from Cellebrite and XRY to obtain data from electronic devices did not present testimony that was based on technical or specialized knowledge that would require expert testimony."); *United States v. Marsh*, 568 F. App'x 15, 16-17 (2d Cir. 2014) (summary order) (affirming admission of non-expert testimony by agent regarding use of Cellebrite software to review information stored on cell phones).

B.   The Defendant's statements are admissible against him.

On the night of August 27, 2019 after his arrest, GRPD detectives interviewed the defendant. The defendant was upset and kept saying that he knew he was in trouble, and the defendant spent time crying while staring at a picture of one of the victims. The defendant also made false, self-serving exculpatory statements during this interview. Later that night and into the early morning hours of August 28, the defendant's jail calls from the Kent County Correctional Facility were recorded. On the jail calls, the defendant admitted to selling drugs to an undercover officer, and asked his mother to get money and "other stuff" from certain locations in their house. The government anticipates playing two jail calls, which were previously provided to

defense counsel through discovery.

The defendant's statements are admissions of a party opponent and admissible under Rule 801(d)(2)(A). While the government may introduce incriminating portions of the Defendant's statements, this does not make self-serving exculpatory portions admissible by the defendant himself. *See, e.g., United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) (holding that an FBI agent was not required to answer questions on cross-examination that sought to elicit exculpatory statements). "[I]f such statements were deemed admissible under Rule 801(d)(2), parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005).

The admissibility of audio recordings rests within the sound discretion of the court. *United States. v. Miller*, 562 F. App'x 272, 290 (6th Cir. 2014) (citing *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983)). Recordings are admissible if they are "authentic, accurate and trustworthy," as well as "audible and sufficiently comprehensible for the jury to consider the contents." *Id.* (quotations omitted). The government does not anticipate objections on these points, but will offer witness testimony to establish authenticity, accuracy, and trustworthiness of the jail calls if necessary.

The use of call transcripts as an evidentiary aid, without admission into evidence, is also a discretionary matter for the trial court. *United States v. Hughes*, 895 F.2d 1135, 1147 (6th Cir. 1990); *United States v. Cooke*, 795 F.2d 527, 530 (6th

Cir. 1986); *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983). The government is providing draft transcripts to Reynolds's counsel for review.

In creating the transcripts, Reynolds's voice been identified. Under Federal Rule of Evidence 901(b)(5), voices may be identified "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." "The standard of admissibility of an opinion as to the identity of a speaker is merely that the identifier has heard the voice of the alleged speaker at any time." *United States v. Cooke*, 795 F.2d 527, 530 (6th Cir. 1986). An investigative officer may properly provide the testimony to establish the identity of a speaker on a recording, even if the identification is based on voice identification subsequent to the recording. *United States v. Hogan*, 402 F. App'x 54, 59 (6th Cir. 2010).

C.   Dan Errico's testimony about his drug-related relationship with the defendant is relevant and admissible.

The government expects to call Dan Errico as a witness. Mr. Errico is a recovering heroin addict who knew A.M. and B.D., introduced A.M. directly to the defendant, and acted as a middleman between the defendant and B.D. The government expects Mr. Errico to testify that between March and September 2019, he relapsed on heroin and was using up to one gram of heroin daily. He had four heroin dealers, including the defendant, who he knew as "J." Mr. Errico bought heroin from "J" in the parking lot behind the corner store on Fairbanks and Clancy whenever his primary heroin source was not available. On August 20, 2019, Mr. Errico purchased heroin from "J" twice. Mr. Errico will testify that he provided the heroin to B.D., which had pink or purple coloring, and ultimately resulted in B.D.'s death.

Mr. Errico will testify that he also overdosed after using this heroin but survived. Mr. Errico will testify that he used the purple heroin from "J" multiple times after that, and overdosed many other times. Mr. Errico's testimony regarding his drug deals with "J," even those that have not been charged here, and Mr. Errico's subsequent overdoses from those drugs, is relevant and admissible as "res gestae" or intrinsic evidence.

### i.    *Errico's testimony is relevant.*

"Evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence is relevant." *United States v. Sumlin*, 956 F.3d 879, 888 (6th Cir. 2020) (internal quotation marks and citations omitted); *see also DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 475 (6th Cir. 1996) ("Even if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has the slightest probative worth.").

Here, Mr. Errico will testify as the defendant's former heroin customer, and as the nexus between A.M., B.D. and the defendant. Mr. Errico will also testify that he was the middleman who bought the fatal drugs from the defendant and distributed them to B.D. His testimony regarding uncharged drug deals and overdoses is relevant and necessary to contextualize these relationships. Mr. Errico's testimony is also highly probative regarding the location of his drug deals with the defendant: in the area of the corner store at Fairbanks and Clancy, the same location the defendant sold drugs directly to A.M. Mr. Errico's testimony regarding his multiple overdoses

on the defendant's drugs is also highly probative of the fatal nature of the drugs the defendant distributed to A.M. and B.D., and not unfairly or overly prejudicial. Accordingly, even though Mr. Errico's testimony is necessary for the government to prove the defendant is guilty of the offense charged in count two (B.D.'s death), it also provides the necessary context for these relationships and locations, and is therefore relevant. *See Sumlin*, 956 F.3d at 889 (quoting *United States v. Whittington*, 455 F.3d 736, 739 (6th Cir.2006) ("[R]elevance threshold is very low under Rule 401, and . . . the government is permitted to build an incremental case.")).

ii.   <u>*Errico's testimony is admissible and not subject to Rule 404(b).*</u>

For the same reasons stated by the Sixth Circuit in *United States v. Sumlin*, Mr. Errico's testimony is admissible as *res gestae* evidence, as well as evidence that is "inextricably intertwined" with evidence of the offenses charged in the superseding indictment. *See Sumlin*, 956 F.3d at 889-91.

In *Sumlin*, the Sixth Circuit affirmed the district court's admission of the testimony of Sumlin's ex-girlfriend, who was also his prior drug customer, and the sister of the decedent. *Sumlin*, 956 F.3d at 888-89. She testified that she saw her sister, the decedent, with Sumlin at their mother's residence in the morning of the day her sister was later found dead. *Id.* She also testified about her sister's past and continued drug abuse, and that Sumlin was a drug dealer who routinely delivered drugs to her at her mother's residence in the past. *Id.* The Sixth Circuit held that her testimony, "in which she reveals her previous drug use and past drug purchase history from Sumlin, constituted both proper *res gestae* evidence, as well as evidence

that is "inextricably intertwined" with evidence of Sumlin's [charged offense conduct]." *Id.* at 889. Therefore, Rule 404(b) did not apply. *See id.* ("Rule 404(b) does not apply to evidence that itself is probative of the crime charged . . . includ[ing] intrinsic acts evidence that relates to those acts that were necessary preliminaries to the crime charged.") (internal quotation marks, punctuation, and citations omitted).

So too here. First, Mr. Errico's testimony is properly admitted as *res gestae* evidence because it "has a causal, temporal or spatial connection with the charged offense[s]." *Sumlin*, 956 F.3d at 890 (quoting *United States v. Hardy (Marlando)*, 228 F.3d 745, 748 (6th Cir. 2000)). "[S]uch evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of the witness's testimony, or completes the story of the charged offense." *Id.* Mr. Errico will testify about how he knew A.M. and B.D. He will testify that he introduced A.M. to the defendant so that A.M. could buy heroin directly from the defendant. Mr. Errico will also testify about how he acted as a middleman, buying heroin from the defendant to give to B.D. All of this testimony is probative of the charged offenses. Moreover, Mr. Errico will testify about using and overdosing on the heroin he bought from the defendant on the same date that A.M. and B.D. overdosed and ultimately died, and that he subsequently purchased the same heroin from the defendant multiple times after that, overdosing many more times. This forms an integral part of Mr. Errico's testimony, is probative of the fatal nature of the drugs charged in counts one and two, and completes the story of those

offenses. Accordingly, this testimony is properly admitted as *res gestae* evidence. *See Sumlin*, 956 F.3d at 889-91.

Second, Mr. Errico's testimony regarding uncharged drug deals with the defendant and subsequent overdoses is "inextricably intertwined" with the offenses charged in the superseding indictment. *See Sumlin*, 956 F.3d at 889 (quoting *United States v. Barnes*, 49 F.3d 114, 1149 (6th Cir. 1995) (additional citation omitted)). Mr. Errico's testimony largely paints the picture of a singular criminal episode committed by the defendant: his four to five-month period of dealing dangerous heroin directly to Mr. Errico and the effects of those drugs. To be clear, Mr. Errico will testify that he used the purple heroin for the first time on August 20 and overdosed after using it, the same date charged in counts one and two, where the defendant also distributed the deadly heroin directly to A.M., and indirectly to B.D., through Mr. Errico. His testimony is therefore properly admitted as intrinsic to the charged offenses, and Rule 404(b) does not apply.[1]

    D.    Business records from electronic communication service providers, PNC Bank, Meijer, and Cash App are admissible.

During its investigation, the government obtained a number of records from electronic communication service providers (Verizon Wireless, AT&T, Google, etc.), PNC Bank, Meijer, and Cash App. These records were previously made available to the defendant through discovery. The records are voluminous.  The government does

---

[1] Alternatively, Mr. Errico's testimony regarding uncharged drug deals and subsequent overdoses is admissible under Rule 404(b) to prove the defendant's identity as the individual distributing the deadly drugs, or as a common scheme or modus operandi.

not intend to seek the admission of these records. Instead, it will be seeking to admit relevant summaries of these records pursuant to Federal Rule of Evidence 1006 as outlined in section E. But for foundational purposes, these records are admissible as self-authenticated business records under Rule 902(11) and not hearsay under Rule 803(6). The government anticipates a stipulation regarding these records.

E. The Government intends to offer Rule 1006 summary exhibits regarding historical cell-site location data, phone tolls, and text messages.

The government intends to offer summary exhibits at trial showing historical cell-site location data, text messages, and relevant phone tolls/call logs. Summary exhibits are admissible as substantive evidence under Rule 1006 when: (1) the underlying documents or records are so voluminous that they cannot be conveniently examined in court; (2) the proponent of the summary must have made the documents available for examination or copying at a reasonable time and place; (3) the underlying documents must be admissible in evidence; (4) the summary must be accurate and non-prejudicial; and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation. *United States v. Moon*, 513 F.3d 527, 545 (6th Cir. 2008); *United States v. Jamieson*, 427 F.3d 394, 409 (6th Cir. 2005). All factors are satisfied for the proposed summary exhibits: the underlying records, obtained from search warrants and grand jury subpoenas to wireless service providers and other businesses are voluminous, technical, and not easy to digest without summarization. These underlying records were previously made available to the defendant through discovery, and they are admissible as self-authenticated business records under Rule 902(11) and not hearsay under Rule

13

803(6), even though the government does not intend to admit the records themselves at trial. The government anticipates a stipulation to the admissibility of the underlying records. The summaries are accurate, and the officer who prepared the summaries will introduce the exhibits during his testimony at trial.

One of the summaries that will be offered are aerial maps that plot the location of historical cell-site location and GPS data for cell phones belonging to the defendant, A.M., B.D., and Dan Errico on August 20, 2019, the day of the drug deals that led to the overdoses. These maps are admissible as summary exhibits. *See, e.g.*, *United States v. Hill*, 604 F. App'x 759, 784 (10th Cir. 2015). The government intends to call GRPD Det. Thomas Heikkila to testify about how the data was plotted to create the summary exhibit. That testimony does not amount to an expert opinion. *See United States v. Graham*, 796 F.3d 332, 365-66 (4th Cir. 2015) (citing *United States v. Henderson*, 564 F. App'x 352, 364 (10th Cir. 2014)) ("The maps plot the locations of certain cell sites listed in the [cell-site location information] records, the business establishments robbed, and Jordan's apartment. The maps also identify the dates and times of inbound and outbound calls made by Appellants' phones through the plotted cell sites. . . . The minimal technical knowledge or skill required to complete this task was not so 'specialized' as to constitute a matter of expertise within the meaning of Rule 702."), *reh'g en banc granted and vacated on other grounds*, 824 F.3d 421 (4th Cir. 2016); *United States v. Baker*, 496 F. App'x 201, 204 (3d Cir. 2012) ("[T]he agent's testimony about his use of the mapping software was not expert testimony and it was not an error for the District Court to properly admit it as fact.").

The government will also offer summaries in the form of phone toll logs for cell phones used by the defendant, A.M., B.D., Dan Errico, and the defendant. The call logs are 1006 summaries in that the calls and texts displayed are limited to those relevant to the charges at issue. The government also intends to offer summaries showing text messages between the defendant and A.M., the defendant and Dan Errico on August 20, 2019, and the defendant the undercover officers on August 27, 2019. To the extent these text message summary exhibits show text messages setting up uncharged drug deals by the defendant, this evidence is admissible for the reasons stated above regarding Dan Errico's testimony. The Sixth Circuit has also "repeatedly recognized that prior drug-distribution evidence is admissible to show intent to distribute." *United States v. Ayoub*, 498 F.3d 532, 548 (6th Cri. 2007) (affirming the admission of unrelated drug distribution from four years prior to the charged offense to prove identity and intent to distribute); *see also United States v. Jenkins*, 345 F.3d 928, 938 (6th Cir. 2003) (collecting cases).

The government has produced the relevant cell phone evidence in discovery. It also noticed its intent to use evidence of uncharged acts of drug distribution by the Defendant in its Initial Pretrial Conference Summary Statement. (R.7: Gov't IPTC Sum. Stmt., PageID.11-14.)

F.   Text messages between the defendant and A.M., the defendant and Dan Errico, and the defendant and an undercover police officer are <u>admissible.</u>

The government intends to offer the content of text messages between the defendant and A.M., the defendant and Dan Errico (the middleman for B.D.), and the undercover officer setting up the drug deals. The defendant's own statements are

admissions of a party opponent and admissible under Rule 801(d)(2)(A). The other parties' statements in the text messages are admissible to prove context, and these out of court statements are not hearsay because they are not being offered for the truth of the matter asserted. Instead, as the Court and jury will see, the text messages are a series of questions and commands between the defendant and the other party, not assertions, that are offered not for their truth of their assertions, but as evidence of the fact that the messages were sent at all, which will show that the defendant and the other party planned to meet up for a drug deal that evening.

"A statement offered as evidence of the bare fact that it was said, rather than for its truth, is not hearsay." *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009). "Questions and commands generally are not intended as assertions, and therefore cannot constitute hearsay." *Id.* at 315. In *Rodriguez-Lopez*, DEA agents orchestrated and observed a controlled buy for heroin with Robles. Rodriguez-Lopez was sitting nearby acting as a lookout for Robles. After DEA agents conducted the buy and arrested Robles, Robles informed the agents on scene that Rodriguez-Lopez was acting as his lookout. Meanwhile, agents stopped Rodriguez-Lopez while he attempted to drive away. Agents interviewed him and Rodriguez-Lopez denied knowing anything about the drug deal. During the interview, Rodriguez-Lopez's cell phone rang repeatedly. Each time, the agent answered the phone and heard the caller request heroin. The district court suppressed evidence of these phone calls as hearsay, but the Sixth Circuit reversed, holding it did not matter "whether the callers phrased their statements as declarations ("I want some heroin."), questions ("Can I

get some heroin?"), or commands ("Bring me some heroin."), because the statements were not being offered for their truth, but as evidence of Rodriguez-Lopez's participation in the heroin-distribution conspiracy. *Id.* at 314-15. So too here.

G. <u>None of the witnesses are subject to impeachment for a prior conviction</u>.

Federal Rule of Evidence 609(a)(1)(A) provides that, for purposes of "attacking a witness's character for truthfulness," evidence of a criminal conviction "must be admitted, subject to Rule 403 . . . in a criminal case in which the witness is not a defendant" if the crime of conviction was "was punishable . . . by imprisonment for more than one year." Fed. R. Evid. 609(a)(1)(A). Rule 609(a)(2) provides that "for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving — or the witness's admitting — a dishonest act or false statement." Fed. R. Evid. 609(a)(2). Rule 609(b) imposes a 10-year time limit on the above rule, subject to certain exceptions. Fed. R. Evid. 609(b).

Records show that one witness, T.L., has misdemeanor convictions for offenses such as minor in possession of alcohol and domestic violence.[2] Such misdemeanor convictions are not a proper subject for impeachment because they involve neither offenses punishable "by imprisonment for more than one year," nor elements involving "a dishonest act or false statement." Thus, the Court should preclude the defendant from seeking to impeach the witnesses with such convictions. *See* Fed. R.

---

[2] A copy of the criminal histories of the witness will be provided to defenses counsel. Specifics are not provided here to protect the privacy of the witness. No other witnesses have any convictions.

Evid. 609(a). T.L. also has one prior conviction for retail fraud. This is also inadmissible, as elements do not necessarily involve a dishonest act or false statement. "The Michigan statute for . . . retail fraud does not require a dishonest act or false statement for conviction, *see* Mich. Comp. Laws § 750.356d(1), because one way to commit retail fraud is shoplifting, and shoplifting is a crime of stealth, not of dishonesty." *United States v. Bender,* 622 F. App'x 520, 524 (6th Cir. 2015) *citing United States v. Washington,* 702 F.3d 886, 892–94 (6th Cir. 2012).

Respectfully submitted,

ANDREW BYERLY BIRGE
United States Attorney

Dated: April 30, 2021

/s/ Daniel T. McGraw
DANIEL T. McGRAW
ALEXIS M. SANFORD
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404