```
1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3    _____

4    UNITED STATES OF AMERICA,

5                        Plaintiff,

6         v.                         CASE NO:  1:20-CR-24

7    MUSTAFA DEVILLE REYNOLDS,

8                        Defendant.

9    _____/

10

11                           *   *   *   *

12                  CONTINUED DAUBERT HEARING

13                           *   *   *   *

14

     BEFORE:     THE HONORABLE PAUL L. MALONEY
15               United States District Judge
                 Kalamazoo, Michigan
16               August 16, 2021

17   APPEARANCES:

18   APPEARING ON BEHALF OF THE PLAINTIFF:

19        ALEXIS MARIE SANFORD
          DANIEL THOMAS McGRAW
20        Assistant United States Attorney
          P.O. Box 208
21        Grand Rapids, Michigan  49501-0208

22   APPEARING ON BEHALF OF THE DEFENDANT:

23        SEAN TILTON
          JAMES STEVENSON FISHER
24        PEDRO CELIS
          Federal Public Defender
25        50 Louis Street, N.W., Suite 300
          Grand Rapids, Michigan  49503-2633
```

```
 1                      I N D E X
                                                    Page
 2    WITNESSES:

 3
      VLADAN JOVANOVIC:
 4
              Direct Examination by Mr. Tilton        4
 5            Cross Examination by Mr. McGraw         31
              Redirect Examination by Mr. Tilton     45
 6

 7    SY RAY:

 8            Direct Examination by Ms. Sanford      49
              Cross Examination by Mr. Tilton        71
 9

10
      VLADAN JOVANOVIC:
11
              Redirect Examination by Mr. Tilton     88
12

13
                      *   *   *   *
14
                      E X H I B I T S
15                                                  Rec'd.

16    Government Exhibit 100                          39
              (9/2018 report "Geolocation of calls
17            in the Charles Merritt case in California")

18    Government Exhibit 101                          69
              (Screenshot of Sy Ray's screen image
19            of Google Earth)

20
                      *   *   *   *
21

22    Defense Exhibit OO                              93
              (Affidavit from Clayton case)
23
      Defense Exhibit PP                              10
24            (Jovanovic Affidavit)

25    Defense Exhibit QQ                              10
              (Jovanovic Power Point)
```

|         |    |                                                           |
|---------|----|-----------------------------------------------------------|
|         | 1  | Kalamazoo, Michigan                                       |
|         | 2  | August 16, 2021                                           |
|         | 3  | at approximately 9:12 a.m.                                |
|         | 4  | PROCEEDINGS                                               |
| 09:12:31 | 5  | THE COURT:  This is File Number 20-24; The United         |
|         | 6  | States of America vs. Mustafa Reynolds.  This matter is   |
|         | 7  | before the Court this morning on a continuation of a hearing |
|         | 8  | started earlier on July 23rd regarding the defendant's    |
|         | 9  | motion to exclude cell-site analysis.                     |
| 09:12:53 | 10 | The record should reflect that Assistant United           |
|         | 11 | States Attorneys Alexis Sanford and Dan McGraw represent the |
|         | 12 | government; Attorneys Tilton, Fisher, and Celis are here on |
|         | 13 | behalf of the defendant; the defendant is present in person. |
|         | 14 | The Court is ready to proceed.  Mr. Tilton, I             |
| 09:13:11 | 15 | believe you have a witness.                               |
|         | 16 | MR. TILTON:  Yes, your Honor.                             |
|         | 17 | THE COURT:  All right.                                    |
|         | 18 | MR. TILTON:  Your Honor, defense calls Dr. Vladan         |
|         | 19 | Jovanovic.                                                |
| 09:13:15 | 20 | (Dr. Jovanovic appearing remotely via                     |
|         | 21 | teleconferencing.)                                        |
|         | 22 | THE COURT:  Dr. Jovanovic, it's necessary for you         |
|         | 23 | to take an oath.  Would you raise your right hand, sir.   |
|         | 24 | VLADAN JOVANOVIC,                                         |
| 09:13:36 | 25 | was thereupon called as a witness herein, and after having |

1    been first duly sworn to tell the truth, the whole truth and

2    nothing but the truth, was examined and testified as

3    follows:

4              THE COURT:  The record should also reflect that the

09:13:40    5    witness is testifying via ZOOM by stipulation of counsel.

6              Mr. Tilton, you may proceed.

7              MR. TILTON:  Thank you, your Honor.

8                        DIRECT EXAMINATION

9    BY MR. TILTON:

09:13:48    10    Q.   Good morning, Dr. Jovanovic.

11    A.   Good morning.

12    Q.   Could you please tell me what your profession is?

13    A.   I am an electronic engineer --

14    Q.   One moment, please.  One moment here, please.  We are

09:14:11    15    trying to get a little more volume.

16              THE COURT:  Let's start again, Mr. Tilton.

17              MR. TILTON:  Thank you.

18    BY MR. TILTON:

19    Q.   Dr. Jovanovic, we are going start that over.

09:14:24    20              Could you please state your profession for the

21    record?

22    A.   I am an electronic engineer.

23    Q.   And in this case, did you prepare an affidavit?

24    A.   I did.

09:14:41    25    Q.   And is that affidavit notarized from the 11th of

1    August, of this year?

2    A.    I believe it is notarized, probably 11th, right.

3    Q.    And does the affidavit include your resume as well?

4    A.    It does.

09:15:04  5    Q.    Could you describe some of your background, educational

6    background, and relevant work experience?

7    A.    I got a Bachelor's my Master's and PhD degrees from the

8    University of Belgrade in Yugoslavia.  Over there I worked

9    for about ten years on developing the mobile -- digital

09:15:36  10    mobile radio systems pretty similar to second generation

11    cell mobile radios, except they were in the shoe box size at

12    the time.

13        In 1991, I moved to North America.  I first got

14    employed by University of Toronto as a research associate.

09:16:03  15    I've stayed there almost two years.  I worked on several

16    projects there, but biggest one and most famous is the

17    propagation -- radio frequency propagation measurements in

18    the field.  The paper we wrote about that was cited about

19    more than 200 times in various books, other papers, even

09:16:37  20    patents and so on.

21        I believe in '93 I got employed, found job at Bell

22    Mobility Cellular, that was a cellular operator in Canada,

23    in Ontario and Quebec.  I stayed there for -- until '95 or

24    so, '96, sorry, I'm looking at my resume.  I'm not too good

09:17:04  25    with the numbers.

1          When I went to another cellular operator company,

2     which is PrimeCo Personal Communication, which is now part

3     of Verizon Wireless.  I worked there in various managerial

4     positions and ended up being director of systems in radio

09:17:26   5     frequency engineering.

6          After PrimeCo, that was in 2000, I started working

7     for Lucent Technologies, which is maker of the -- I'm sorry,

8     the printer here is on.  Okay.

9          So I started working for Lucent, which is a

09:17:56  10     manufacturer of the equipment that cellular operators use,

11     so I am pretty familiar not only with the field, but

12     equipment, how that equipment is made.  In the process of

13     that I worked extensively with call detail records, even in

14     PrimeCo, but in Lucent, big part of my work was related to

09:18:24  15     call detail records.

16          In 2007, I left Lucent to become a CTO of Newfield

17     Wireless, which is, at that time it was another small

18     start-up company that was -- its main product -- it had

19     services related to radio frequency drive testing and

09:18:51  20     calibration of the radio frequency propagation prediction

21     tools.  But most of my time there was devoted to the

22     development of a software that allowed for cellular

23     operators to map their calls based on call detail records,

24     which is geolocation of calls.  I was responsible for

09:19:16  25     practically all geolocation algorithms there.

1          And since about 2007 or early 2008, I became

2    consultant, independent.  I was engaged for several

3    companies, I worked as a consultant for, including Newfield

4    Wireless, too.  I retired in 2017, but it is still semi

09:19:47  5    retirement.  I'm doing some consulting work on and off in

6    the last four years.

7    Q.   So you've been involved in various radiofrequency and

8    cellular positions since at least 1991?

9    A.   I was since --  Yes, '91.  I worked with radiofrequency

09:20:17  10    equipment, I was making radios since 1991, but cellular

11    either equipment makers or operators that use that equipment

12    since '93, I believe.

13    Q.   Do you hold six U.S. patents?

14    A.   I do.

09:20:38  15    Q.   And what is the general category of those patents?

16    A.   They are all in cellular engineering.  In particular,

17    maybe not majority of them, but at least three are related

18    to various problems with handoffs when mobile change off

19    from one cell to another.  So three of these patents are

09:21:11  20    related to the handoffs.

21    Q.   Have you ever authored any publications in any

22    technical journals?

23    A.   I did, yes.  I have over 30 published papers, mostly at

24    IEEE a journal for electronics engineers in their journals,

09:21:37  25    which are probably the most esteemed in the field.

|   |   |
|---|---|
| 1 | Q.   And have you been retained by my office in this case? |
| 2 | A.   I was. |
| 3 | Q.   And are you being paid $250 an hour? |
| 4 | A.   That is correct. |
| 09:21:57  5 | Q.   And have you worked about 30 hours on this case? |
| 6 | A.   I believe so, yes. |
| 7 | Q.   What information have you reviewed in preparing for |
| 8 | this case? |
| 9 | A.   I had transcript of the first part of this hearing.  I |
| 09:22:18 10 | had raw data files provided by various operators, and I had |
| 11 | files produced by TRAX tool that provide mapping and Google |
| 12 | Earth. |
| 13 | Q.   This case involves TRAX and its founder, Sy Ray, has |
| 14 | testified.  Prior to working on this case, were you familiar |
| 09:22:51 15 | with TRAX and Sy Ray? |
| 16 | A.   I was familiar.  There was one case in State of New |
| 17 | York.  It's a case where I was retained by the defense.  I |
| 18 | basically wrote a report about TRAX presentation that was |
| 19 | done, and appeal actually consulted with me during the trial |
| 09:23:25 20 | itself, but they contact me in the middle, I couldn't really |
| 21 | provide much help not given any of the data.  There was an |
| 22 | enormous amount of data, but I prepared a report about TRAX |
| 23 | presentations specifically. |
| 24 | Q.   And when you prepared -- |
| 09:23:45 25 | A.   There was -- |

1    Q.   Oh, excuse me.

2    A.   Sorry.

3    Q.   When you prepared your affidavit in this case, did you

4    incorporate some of your past work and research you had done

09:23:55    5    about TRAX?

6    A.   I did, yes.

7    Q.   And are your --  Sorry, I didn't mean to cut you off.

8    A.   Yes.  There were at least two other cases I can think

9    of.  There was a case in California, I believe it was State

09:24:15   10    of California against Charles Merritt where Mr. Ray produced

11    one of these KMZ files, and I prepared a lot of stuff about

12    that.  But prosecution, they didn't use those exhibits at

13    that trial.  And third time was -- I was retained by the

14    public defender in Rochester, and I prepare a big report,

09:24:54   15    parts are included in this one.  That case stopped, I

16    understand that some plea bargain was made, so case was

17    removed from the public defender's office, and I don't know

18    how the report was used.

19    Q.   Are your --

09:25:15   20    A.   If it was used.

21    Q.   Are your opinions in this case consistent with your

22    opinions in those prior cases?

23    A.   Absolutely.

24    Q.   Now, you prepared an affidavit in this case which

09:25:30   25    included -- do you have that affidavit in front of you?

A.    I can open it in a second.  Give me just a second, I'm

sorry.

          (Pause in proceedings.)

          THE WITNESS:  I have opened it.

09:26:14     MR. TILTON:  Your Honor, I would move for the

admission of Defense Exhibit PP.

          THE COURT:  Any objection?

          MR. McGRAW:  No objection.

          THE COURT:  Received.

09:26:23  BY MR. TILTON:

Q.    Did you also prepare a Power Point presentation in

advance of your testimony today?

A.    I did.

Q.    And do you have that open in front of you?

09:26:38  A.    I do.

Q.    And that has been marked as Exhibit QQ.

          MR. TILTON:  I would move for admission of Defense

Exhibit QQ.

          MR. McGRAW:  No objection, your Honor.

09:26:50     THE COURT:  Received.

          MR. TILTON:  All right.

BY MR. TILTON:

Q.    Let's talk through that Power Point.

          In the first section of your Power Point deals with

09:27:05  peer review of TRAX software.  Has TRAX been subjected to

peer review?

A.    I don't think it can be subject to the peer review in usual normal sense, basically no communication describing the methodologies have been used by TRAX to create the exhibits have been provided to Court in this case nor in any other case I was previously involved with.  If your search Google Scholar for any books, technical papers or patents by Mr. Ray, they are none that I found documented in the report.  Searching Google patent search database didn't reveal any patents assigned to that TRAX company.  And on the ZetX website, there are no write-ups provided by ZetX personnel.  They give some documents by other authors that allegedly endorse the methodology, but nothing by ZetX. There is also no peer reviewable data analysis the statistical data analyzing to corroborate accuracy claims that's available on the website or anywhere else that I am aware of.

       Furthermore, ZetX on their website claims their mapping system is proprietary, and proprietary systems are not peer reviewable by definition unless they are patented. In telecommunications industry, proprietary can mean either patent protected or company confidential.  If it's not patent, you can review confidential, you can't review that. So in this case, I was basically forced to rely on transcripts of the hearing and also on the information that

1    is available on the ZetX website about the TRAX.

2    Q.    Based upon your experience in the radiofrequency and

3    cellular scientific communities, has TRAX generally been

4    accepted in those communities?

09:29:44    5    A.    I am not aware --  Restate that, your Honor, I'm sorry.

6    Q.    That was --  I guess we are not to that point, but

7    it's --

8    A.    There is one of the slides later on where I address

9    that part.  If you can jump to Slide 3 -- I'm sorry, I can't

09:30:11   10    see what is on the screen over there.  Mr. Tilton, you work

11    through this.  You tell me, you ask me questions about that.

12    Q.    Let's talk -- we will come back to that.

13          There on Slide Number 4 refer to technical

14    references from the ZetX website?

09:30:45   15    A.    That's correct.  That's various writings they included

16    in there.  There is none that they wrote themselves, but

17    there are two of mine.  One is my C.V., which was put there

18    without any notification or permission from me, which I

19    found very unusual, and little bit concerning because my

09:31:12   20    home address at the time, you would expect that somebody

21    would ask.  And there is also sample of the report by me,

22    and I would like to address some details later on.

23          I believe that contents of that report was

24    completely misinterpreted.

09:31:37   25    Q.    Would any of your research or work support the -- what

1    Mr. Ray refers to as the horizontal plane or the way -- or

2    the TRAX software, the mapping?

3    A.   No, I don't believe that anything in technical

4    literature on radiofrequency propagation supports that.

09:32:05  5    I've never seen that used in any RF engineering books,

6    technical papers, patents, anything like that.

7          I haven't seen that used in any tools that other

8    engineers use in their everyday work.  You know, for mapping

9    or any propagation or any other tools or any of their

09:32:33  10   processes that they do in their everyday work.

11   Q.   The ZetX website, above where your name and C.V. is

12   listed, lists four different papers, the first is project

13   Basta.  Are you familiar yeah with that paper?

14   A.   I am.

09:32:59  15   Q.   Does that support the TRAX software in any way?

16   A.   I don't believe so.  That's basically a, called antenna

17   characteristics are to be defined as you go so on and so on,

18   it is not in the field.

19   Q.   Next, the SWGDE recommendations for cell-site analysis,

09:33:26  20   is that supportive of the TRAX software?

21   A.   I -- not in my opinion.

22   Q.   And then we have the NIST, the N-I-S-T, guidelines on

23   mobile device forensics.  Is that supportive of the TRAX

24   software?

09:33:44  25   A.   No.  I think it's very old document, probably before

1    TRAX was even available, and it shows actually the buyer

2    wedge on three or four pictures in there, not these antenna

3    horizontal patterns.

4    Q.    And then in the final document is the IEEE transactions

09:34:10    5    on antennas and propagation, is that supportive of the TRAX

6    software?

7    A.    I don't believe so.  That's a journal, so unless you

8    have a journal and put the paper -- I mean journals don't

9    support anything, but I'm not aware of any paper and

09:34:30    10    transactions and antennas in propagation or transactions of

11    communications or personnel communications or personal

12    communications magazine or communications magazine where any

13    of that -- any of this presentation matter was ever

14    mentioned, used or anything like that.

09:34:51    15    Q.    In the next page of your Power Point presentation, we

16    will get to TRAX geolocations.

17    A.    Yep.

18    Q.    Do you believe that the TRAX geolocations are accurate?

19    A.    Well, there are two types of geolocations that TRAX did

09:35:13    20    for this case, one is when for each call only sector

21    coordinates and azimuth are available in that such case TRAX

22    shows sectors estimate the coverage area and channel borders

23    based on an antenna pattern, which is unspecified.  It

24    appears to be the same on all sectors independent of

09:35:42    25    actually.  Of actualizing configuration.  So you have quite

1    different patterns of antennas of 0120 to 40 and 0100 and

2    220.

3         And they are all same in -- for all sectors, the

4    same shape, they are just scaled to various sizes.  That

09:36:12  5    type of presentation is used for all call records on AT&T

6    and some of the calls that were made on Verizon's network.

7         Verizon has special set of call records, which are

8    for LT.  LT is long-term evolution, that's basically four

9    generation technology that are now advertising in such case

09:36:44  10   besides latitude, longitude of the sector and azimuth, they

11   also give a distance measurement.  And in such cases, ZetX

12   shows an arc at the measured distance, size of the arc,

13   angle or length of the arc, if you want.  It is not defined,

14   appears to be plus or minus 70 from the azimuth in all

09:37:18  15   cases, but I check only a few, so I can't be sure.

16        Nothing on the ZetX website or in their promotional

17   media talks about such presentation.  They talk only about

18   the first type when distance is not available, and they go

19   into great length about was the right pattern to describe

09:37:49  20   the sector coverage this antenna overlay versus pie and

21   wedge that most other people use.  FBI whenever I saw their

22   experts testify, they use pie and wedge, not antenna shapes.

23   Q.   Let's talk about the two different types of

24   geolocation.  The first, when we talk about antenna pattern

09:38:15  25   method, we are on Slide Number 6, are we talking about what

1    Mr. Ray refers to as the horizontal plane?

2    A.   Yep.

3    Q.   And that is not something that is accepted in the

4    community of scientists or practicing professionals in the

09:38:30   5    field of radiofrequency engineering; is that true?

6    A.   Not only that it's not accepted, but Mr. Ray advertises

7    on his site that he is the only one who uses that method.

8    If you jump to Page 7, I think there is snapshot from the

9    website.

09:38:51   10   Q.   And this is a --  Looking at Slide Number 7.  This is

11   the --

12   A.   Yep.

13   Q.   This is something that you took off of a ZetX or TRAX

14   website?

09:39:03   15   A.   That is correct.  On August 6, I believe.

16   Q.   And so outside of TRAX and Mr. Ray, are you aware of

17   any other scientists or group that uses this horizontal

18   plane?

19   A.   I've never seen it in any book, paper, patent.  I've

09:39:27   20   never seen it used in -- by cellular operator in anything

21   they do, their RF engineers do.

22          And not only that I've never seen it, but

23   theoretically in the most ideal case, the sector coverage

24   shape is not like the antenna shape.  And I have in the

09:39:59   25   report theoretical analysis that doesn't hold for one

1    isolated sector transmitted.  It doesn't hold and you have

2    three sectors of antenna transmitting.  It doesn't hold when

3    you have a bunch of other cells with three sectors

4    transmitting around the cell, they're never like antenna

09:40:21  5    patterns.

6          I also in the report -- and if you want, I put some

7    of these slides in the appendix here, if you get an idea

8    from there what they look like, and they are nothing like

9    that in real life.

09:40:40  10   Q.   And so there isn't any scenario where this horizontal

11   plane would be an accurate representation of where a

12   cellular phone might be located?

13   A.   I can't think of -- I mean, you know, you have millions

14   of sites, so there might be somewhere, you know, it can be

09:41:03  15   used, but for normal cell sites, normal networks, that's

16   just not what the sector coverage looks like.

17   Q.   And talking about the horizontal plane, you've looked

18   at different planes or different horizontal planes before

19   this TRAX software update and after the software update?

09:41:37  20   A.   I did, yes, I have some examples.

21   Q.   And can you tell me, if anything, what you know about

22   whether or not the software was accurate prior to the update

23   or if it's more accurate after the update?

24   A.   Okay.  There are two aspects of accuracy, one is the

09:41:59  25   shape, which is all wrong; the other is the size.  After the

1    update, I don't see any difference in the shape.  It is as

2    wrong as it was wrong before.  I see that there were

3    difference in shape sizes, and in some cases differences

4    were almost impossible to understand.  The sector size were

09:42:30   5    the same input data increased 2.5 times, which is like six

6    times an area in distance, in the range, it increased 2.5

7    times which is like 6.25 times in area.  And that same input

8    data, so it looks very weird.

9    Q.   Let's talk about accuracy.  There are various claims of

09:43:04   10   accuracy by Mr. Ray in the website.

11   A.   That is correct.

12   Q.   Let's -- let's start with Slide 39 in your Power Point.

13   A.   Which slide?

14   Q.   39?

09:43:30   15   A.   Okay.

16   Q.   And is that -- on that page, does it say that it's --

17   and did you find this page somewhere?

18   A.   Yes.  It's from ZetX website.  If you look in the upper

19   corner you can see the actual URL of the web page, so you

09:43:56   20   can see that is ZetX.com/TRAX, also accessed on August 6.

21   Q.   And that claims it's 98 percent accurate?

22   A.   That's what is on the website, yep.

23   Q.   And have you heard of other claims of accuracy of --

24   A.   I --  Transcript shows 95 percent during the

09:44:26   25   preliminary hearing.  And I would like to emphasize here

that its accuracy in terms of mapping and ranging at the

hearing first part of the hearing 25 percent defined

different in terms of range, and mapping, it was defined as

the probability that phone would be in the area indicated by

TRAX.  And this substantial different definitions I can

elaborate on that if you want, it's kind of technical.

Q.    Let's first talk about the-- what accuracy or error

rate you believe, if you believe, that would apply to TRAX?

A.    If you pull Slide 9, you have two successive calls.

TRAX normally shows sector estimates -- sector coverage

estimates individually as you progress call by call and

doesn't show where the neighboring cells are, so you can't

do any scientific check.  But basically here, I just read

the time scale parameters so I show two consecutive calls

together.  And if you look at this, this is something that

is theoretically and practically impossible in the field.

We have one sector which is completely encompassed within

the other sector.  And both sectors cover distance between

these two cells is about -- cell, when I say cell, that's

probably what you would call cell tower, distance is

something I believe around 175 miles, and if you're 200

yards in front of one of these two, there is no practical,

no theoretical way that you can be talking to the other cell

that is 175 miles away.  In the report I give the

calculation based on universally accepted model for

radiofrequency propagation in various environments, and I

believe if you're like 250 yards from one site, the site is

1.7 miles away would be received at five, 6,000 times less

power, so the chance that you will be connecting to that

09:47:22  farther sector is practically nil unless something broke

down.  Cell is not operational or the antennas, you know,

there was a tornado, antennas broken down or something like

that.

So in the report, I also do a little bit of due

09:47:43  diligence that engineers would do in such a case.  So I

analyzed the elevation pattern in between two geographical

variations of the terrain height.  I looked at the terrain

morphologies, I looked at both sides there, how tall they

are, how high the antennas are.  And based on that analysis,

09:48:14  the hand-off area would be -- as a fair approximation,

halfway between these two.  They are at the same height

antenna, but they both propagate to the same signal,

suburban radiofrequency, so there is absolutely no way that

the borders can look like this.

09:48:34  Q.   The due diligence that you are describing, is that in

Slide 31 of your presentation?

A.   Just a second.

(Pause in proceedings.)

THE WITNESS:  Yes.  That is an example.  I drew the

09:48:51  in Google Earth, I drew the line in between two cell towers,

1    and on the bottom part of the picture you see the ground

2    elevation and you see that there is actually a ridge in

3    between, and it's very likely that both cells are -- will be

4    covering up to that ridge, you know, and not past that ridge

09:49:22   5    in the direction away from them.

6            The next slide also shows what RF engineers

7    normally do in such cases.  They look at the, in Google

8    street view they look for the actual cell towers and

9    antennas and try to see, you know, if there is anything

09:49:46   10   unusual, if one is 300 feet and the other 30 feet which

11   would also change the propagation on the ground.  You see

12   that both are roughly of the same type and height.  So those

13   are kind of things that they would look for.  And they would

14   also look if there are any tall buildings, natural

09:50:08   15   obstacles, you know.  To make the point, you know, if you

16   have an Empire State Building along this part, then it would

17   change how the radio signals would propagate, but there is

18   basically nothing on this part that would suggest that there

19   is substantial difference in signals that would come from

09:50:35   20   both of these sites.  The radiofrequency waves go to pretty

21   much the same environment in terms of the electromagnetics.

22   BY MR. TILTON:

23   Q.   So based on these errors and a review of the materials

24   for this case, do you believe that a 95 percent accuracy

09:50:55   25   overstates the accurateness of TRAX?

1    A.    I believe that both 95 and 98 overstate.  And you can

2    think of that as distance being accurate with error of two

3    or five percent or whatever happens to be, that can't be the

4    case.  And if you look at Slides 10 and 11, you'll see an

09:51:25   5    example.  And if it's meant to be that sector borders are

6    accurate 95 or 98 percent of the sectors, that also can't be

7    true.

8    Q.    You talked about a second way that TRAX attempts to

9    geolocate calls, and those were the arcs?

09:52:10   10    A.    Okay.

11    Q.    And that is Slide 13 in your presentation?

12    A.    Okay.

13    Q.    Can you talk about the accuracy of that method and how

14    TRAX uses it?

09:52:25   15    A.    Okay.  That was referred during the hearing as time

16    difference of arrival method, which is wrong.  It's not time

17    difference of arrival.  It's time of arrival.  If time

18    difference of arrival, you would have to draw comparables

19    around cells, not circles.  And time of arrival is usually

09:52:47   20    reserved for case when you have more than one measurement.

21    When you have only one measurement, that's called in cans

22    sell I.D. method.  That method is known and generally

23    accepted.  It is described in the literature in

24    geolocations.

09:53:05   25    Q.    Oh, could you speak a up a little, please.

A.   There is specific reference book on geolocation that's
over thousand pages.  It talks about -- they say nothing
about the antenna patterns on the ground.  For example,
there is another book that discusses, I also listed in the
report that discusses the incident time of arrival.  It's
normally accepted and described the literature as I
mentioned; however, the accuracy stating during the hearing
in July, whenever it was, 23rd, are not correct.  The errors
are not within 17 meters as a conservative estimate, as the
Court heard.  It's actually measurements of the distance are
in the units of 78 meters.  So you are -- The report at 78,
156, three times 78, and all of that, that is called
resolution technique.  But there are errors behind -- there
are rounding errors caused by using this unit which comes
from the noises marked by propagation and several other
sources.

I was able to find one public domain paper that
reports the accuracy results by looking at those distance
measurements versus distance measurements versus distance
obtained by GPS measurements on the test mobile, and they
find out that in five percent of the measurements, errors
are higher than 169 meters and on the average and in
unfavorable RF environment, five percent of the measurement
errors are over 280 meters plus or minus.  And they find
that one-third of the measurements is -- has error margin of

1    78 meters on the average and larger than 150 meters in

2    unfavorable situations, so I thought that 70 meters is

3    conservative estimate is a little bit of a misstatement.

4    Q.   Now, when you were looking at the arc, you also -- and

09:56:02  5    I'm looking at your Slide Number 16 -- did you also find

6    that certain information was missing from the Verizon CDRs?

7    A.   I'm sorry, which slide number are you referring to?

8    Q.   Slide Number 16?

9    A.   Yes.  If you can jump back to 14.

09:56:28 10    Q.   Okay.

11    A.   So there is -- I made this plot, but that plot's very

12    similar to what was in one of the original government

13    exhibits.  You would probably recognize it.  So there is a

14    call at 4:17 p.m. on the phone number that you can see on

09:56:57 15    the screen that is attributed to Tower 228-501.  When you

16    look at the actual call data records, you will see that it's

17    on cell 501 in market, with the market identity 228, so TRAX

18    abbreviates that to 228-501, nothing problematic here, but

19    when you go and check the Verizon site table that they

09:57:26 20    provided with their files, you can't find --

21         And let me just -- on that Slide 14 you see at the

22    top that it's ERLT report, that means that report for LTE

23    technology on Ericsson equipment.  If you jump now on

24    Slide 15 and look up for site Number 501 in the Verizon site

09:57:52 25    table, which lists all of the sites in the area, so on and

so on, there is no market I.D. 228, and there is no cell 501

which supports Ericsson LT equipment vendor, that would be

in the right most corner under vendor, and channel type

would be LTE.  However, the coordinates of the site are

09:58:20  actually very close to the coordinates that TRAX show.  So

it's possible that they assume because 501 cell is on this

other technology located at that cell -- at that location,

that is where the LTE cell if Ericsson equipment will be

located too.  But that's an assumption which might be true

09:58:49  or might not be true, which I can't be sure has been

disclosed to the Court.

And then on Slide --

Q.   Go ahead.

A.   On Slide 16, if you look at the site coordinates that

09:59:11  Verizon site table -- cell-site table shows, and locate

where the TRAX software puts the site, the location is not

identical.  The difference is under four decimal points or

something like that.  That is probably few yards difference,

but it's not identical, which is very weird, because it

09:59:37  cannot be a type because that explains they upload site

tables automatically and it can't be around in there both

are shown at six significant digits.  So the only

explanation I can think of is that TRAX used some other site

table, not the one that Verizon provided.

10:00:04  Q.   So to create those arcs, TRAX used data that was not

1    contained within the Verizon CDR?

2    A.    I believe so, yes.  I have no other explanation how

3    they would put this site in slightly different location.  On

4    Page 17, you have the location of their site.  And if you

10:00:29  5    compare with coordinates on Slide 15, you see that that is

6    not the same thing.  I have no other explanation except they

7    use some other site table.

8    Q.    So let's go to Slide 25.

9    A.    Okay.

10:01:13  10    Q.    Now, when you use the best server coverage, is that --

11    and this is Slide 25 and 26.  Can you tell me about that?

12    A.    I can.  In the field, sectors overlap, and TRAX made in

13    the original presentation and on their website, they make

14    that point repeatedly, and that's a valid point.  But in the

10:01:47  15    field, the mobile would go normally connect to the site that

16    it sees as the strongest.  So even when the two sectors

17    overlap, mobile would talk to the cell which has stronger

18    signal, particularly at the stronger level.  So in

19    engineering, the borders between sectors are normally

10:02:20  20    depicted by best server coverage maps, not by individual

21    sector coverage maps.

22          And if you actually jump on Slide 23, I have an

23    example using model on flat terrain, ideal environment,

24    everything.  What the sector coverage would look like, and I

10:02:44  25    have overlaid the antenna that was used in that example.

1    And you see that even isolated sector coverage doesn't look

2    anything like its antenna patterns.  And Slide 24, I give

3    the mathematics of that which would show that it would be

4    highly nonlinear in various directions.  And you can't just

10:03:06  5    scale the pattern.  And then Slide 25 shows you how the best

6    server areas would look like when more than one sector is

7    available, and you see that it's again nothing like the

8    antenna patterns.

9         If you go to Slide 27, when you have surrounding

10:03:27  10   sectors and perfect grid and the sense that all cell towers

11   are at equal distance from their neighbors, then you get a

12   hexagonal pattern for those of us old enough to remember

13   early days of mobile cellular telephony, many cellular

14   companies had those hexagons in their logos, you could see

10:03:53  15   on their stores and stuff like that.  That's where they come

16   from.

17        And then if you go further, I have examples for

18   what the real best server maps look in the field and how the

19   sector borders between cells on different same tower and

10:04:15  20   between sectors and different tower, what they look like.

21   And again, that is nothing like the overlay antenna

22   horizontal patterns.

23   Q.   All right.  And then I would like to go back to

24   Slide 19 to your conclusions.

10:04:38  25   A.   If you will permit me, I feel very obliged to say

1    something about my Slide 18.

2    Q.    Yes.  Go ahead.

3    A.    Okay.  Two of those papers that are posted there I

4    mention my C.V., that I'm still very upset that it appeared

10:04:59  5    there without my permission, and in the shape it appeared

6    there.  But that ZetX website also gives my report, which is

7    alleged that -- it's alleged that it endorses ZetX, and I

8    have some examples in the slides, in the backup slides.  I

9    don't believe that anything in that report endorses TRAX

10:05:40  10    approach.  I believe that it's grossly misrepresentation.  I

11    believe, if anything, the stuff that was quoted from there

12    endorses the opposite, the pie shape, if it endorse any

13    particular shape.

14        It was also claimed that the hearing that I used in

10:06:01  15    my testimony, the frequency horizontal planes in earlier

16    case, Mr. Ray referred to those shapes as amoeba shapes.

17    That allegation that I used that in my work is completely

18    false.  I never did that in or out of court.  I will never

19    endorse throwing some unspecified antenna pattern on the

10:06:26  20    ground as a valid representation of sector coverage, no

21    matter what proprietary algorithm is used to scale those

22    patterns.

23        What bothers me even more is that Mr. Ray testified

24    that he is aware of my reports were advocated, see the

10:06:49  25    enclosed.  On his site, that is the first case I mention,

1    Clayton case.  He said that he reviewed that 100 percent,

2    and I am in the report affidavit.  I mean it's blatant that

3    I didn't endorse his method.  I didn't consider them

4    scientifically correct, and I considered them highly

10:07:15    5    inaccurate.  And I, you have in the backup slides the

6    excerpts from the affidavit there.  In that report there are

7    numerous examples of the impossible shapes and size of the

8    sectors.  The fact that my name is used on that ZetX website

9    and in their promotional video as somebody who endorses that

10:07:44   10    is beyond my comprehension.

11         It's also inaccurate that I testified mainly for

12    defense attorneys.  I testified seven or eight times for the

13    prosecution, only once for the defense.  I have bunch of

14    cases where I worked for district attorneys that were

10:08:07   15    settled out of court after my exhibits were sent to the

16    defense.  It's just beyond my comprehension what was going

17    on on the ZetX site and what was said during the hearing.

18    Q.   All right.  Well, now I would like to move to Number 19

19    to, back to your conclusions.  And is it your conclusion the

10:08:36   20    TRAX mapping tool methodologies and algorithms cannot be

21    peer reviewed?

22    A.   That is correct.

23    Q.   And that the TRAX mapping tool methodologies and

24    algorithms are not generally accepted in the relevant

10:08:51   25    scientific community?

1     A.    That is also correct.

2     Q.    And that the technology itself contains a number of

3     errors?

4     A.    It shows in the case when those amoebas are shown, it

10:09:12   5     shows impossible or just wrong estimates of both sizes and

6     shapes.  When it shows the distance measurement target

7     generally acceptable in the scientific community in the

8     books, papers and all of that, but the accuracy claims are

9     exaggerating the accuracy.  And what is really bothersome is

10:09:42  10     that it seems that some -- I have no other explanation that

11     some -- that some other cell-site table was used that was

12     not disclosed to Court or some assumption about the Verizon

13     site table were used that were not disclosed.

14     Q.    And then finally, drive testing is not an accurate way

10:10:08  15     to test the TRAX methodology, is it?

16     A.    Drive test can be used to measure -- to test their

17     methodology.  Using drive tests to train the tool is

18     completely different thing.  So if you take some drive test

19     and try to figure out kind of sector best servers area and

10:10:39  20     kind of borders based on drive tests, you have very hard

21     time for several reasons:  One is that -- main reason is

22     that a normal sector simply don't carry enough radio routes

23     to get the proper estimate; and secondly, the mathematics of

24     that is very involved.

10:11:01  25            The company I worked for organized their own drive

1    test data, Newfield Wireless company, and based on those

2    drive tests data, they tweak the RF propagation tools that

3    almost all cellular operators in U.S. and some abroad use

4    and I'm very familiar with the mathematics involved in that.

10:11:28  5    That is very serious business.  However, once you have a

6    sector coverage estimate, you can drive and test whether

7    your estimates are correct along these routes, that you

8    could drive the radio routes going away from the sector, so

9    in that case they can be used.  Or it can be useful.

10:11:52  10    Q.    Thank you.

11          MR. TILTON:  May I have one moment, please, your

12    Honor?

13        (Pause in proceedings.)

14          MR. TILTON:  Nothing further, Dr. Jovanovic.  Thank

10:12:03  15    you.

16          THE COURT:  Mr. McGraw, you may inquire.

17          MR. McGRAW:  Thank you, your Honor.

18                    CROSS EXAMINATION

19    BY MR. McGRAW:

10:12:07  20    Q.    Good morning, sir.

21    A.    Good morning.

22    Q.    You've been hired by the defendant in this case to

23    review call records and data files associated with those

24    call records that are relevant to this case; is that

10:12:31  25    correct?

```
          1    A.    That is correct.

          2    Q.    And according to your affidavit on Pages 1 and 2, you

          3    reviewed records provided by Verizon Wireless and AT&T for

          4    four different telephone numbers, correct?

10:12:45  5    A.    I believe, yes.

          6    Q.    And the KMZ files that can be displayed in Google

          7    Earth, you also reviewed that data as well; is that right?

          8    A.    That is correct.

          9    Q.    And the transcript from the hearing on July 23rd?

10:13:02  10   A.    That's also correct.

          11   Q.    But you're also aware that defense counsel has had

          12   access to the TRAX software program for approximately a

          13   month or so?

          14   A.    I was not aware.

10:13:18  15   Q.    You were not aware of that?

          16   A.    No.

          17   Q.    But presumably that means defense counsel could have

          18   generated those KMZ files just like Detective Heikkila did

          19   using TRAX; isn't that right?

10:13:33  20   A.    If they had it, probably, I mean.

          21   Q.    And as the defense expert in this case, you could have

          22   done the same thing with access to TRAX?

          23         Are you still there, sir?

          24   A.    Oh, sorry.  I could have, but I have the files that

10:13:53  25   TRAX generated itself.  I'm not sure why would I generate
```

1    the same files myself.

2    Q.   Well, you would do that to test the accuracy of it,

3    right?

4    A.   I test accuracy by looking what the output is, and

10:14:08    5    there are two different files -- sets of files presented,

6    one before and after the update.  I looked at both.  I don't

7    understand why you would want me to -- I mean it's a

8    computer program, you put same input, you get same output,

9    right?

10:14:27   10    Q.   You could take those outputs that the software puts out

11    and you could compare them to other data that you have

12    available to yourself, right, network surveys or drive test

13    data; is that fair to say?

14    A.   I was not provided any drive test data, I don't believe

10:14:43   15    that any drive test data was provided by prosecution.  If it

16    was, defense didn't share with me, so I had no drive test

17    data to compare.

18    Q.   I believe you testified on, during your direct

19    testimony that the drive test data is one way that could be

10:15:07   20    used to test this methodology.  I think that was your exact

21    quote, "it can be used to test this methodology."  That's

22    right?

23    A.   Yes, that's right.

24    Q.   Okay.  And repeatedly we heard during your direct

10:15:20   25    testimony that 95 to 98 percent accuracy is wrong, but

1    someone with your education and background should be able to

2    take the data that is provided to you and come up with some

3    other accuracy figure; is that right?

4    A.    That would take like a year.  You have to --

10:15:42    5    Q.    But you could do it?

6    A.    Hundred sectors for each one to do the analysis of the

7    sort I do along each line; that is, I mean you can do it,

8    but I don't know --

9    Q.    You can do it and you didn't do it in this case; is

10:15:55    10    that right?

11    A.    I did it in my particular example, which was blatant,

12    and obviously wrong.  I didn't do it for each and every

13    sector, no, I did not.

14    Q.    Well, let's look at Page 9 of your slide show.  You

10:16:13    15    discuss calls 121 and 122 for the Verizon phone number

16    ending 5505 (sic. 5055).  What were the dates and times of

17    those calls?  I don't see that on your slide.

18    A.    I don't see -- I can find that.  I think that's

19    contained in the report.

10:16:33    20    Q.    Well, that would be important information to include,

21    wouldn't it?

22    A.    It's included in the report.  If you read the report,

23    I'm pretty sure that you will have dates, times and

24    everything.

10:16:47    25    Q.    Are you referring to your affidavit?

```
          1    A.    I can scan the report probably faster than you can.

          2    Q.    I'm sorry, sir, are you referring to the affidavit you

          3    filed in this case?

          4    A.    Yep.

10:17:00  5    Q.    Maybe we can circle back to that after.

          6          Are you looking in your affidavit right now?

          7    A.    I am trying to find it.  I'll look yet, but I can pull

          8    the file and we can read it live from the presentation.

          9    Those are calls 121 and 122 in TRAX presentation.  TRAX will

10:17:31 10    give you times if you want to see them.

         11    Q.    Okay.  I'll move on.  We will look in your affidavit

         12    for that additional information.

         13    A.    You will see the TRAX file, KMZ file.  Open it, select

         14    121 and 122.

10:17:56 15    Q.    I bring it up because I think during your direct

         16    testimony you were trying to make a point about how, you

         17    know, it's theoretically and practically impossible for

         18    these two calls to be mapped the way they are, but we don't

         19    know the dates and times of that call based on the slide

10:18:11 20    that you created.

         21    A.    Sir, I can, while you're doing this, I can pull the KMZ

         22    and read that for you if that's a problem.

         23          I can -- I am under oath, I'm telling you that

         24    these are calls 121 and 122 from the TRAX presentation.  At

10:18:28 25    this point, I can't find the date and time, but --
```

1    Q.    Sure.  Let's move on to the RTT data that you address

2    just briefly on Pages 14, and more importantly Page 40 where

3    you cite the RTT positioning field performance paper.  Do

4    you recall that?

10:18:48   5    A.    Okay.  You want me to jump to Page 40?

6    Q.    Well, I just want you to confirm that that was the

7    paper that you were citing as the basis of your testimony

8    today, at least as it relates to RTT data.

9    A.    That is correct.

10:19:03   10   Q.    Correct?

11   A.    Yes.  That is correct.

12   Q.    That's a paper from September of 2010?

13   A.    It's a paper from September of 2010 in the IEEE

14   Transactions on Vehicular Technology, that's paper on

10:19:21   15   general on mobile communications.

16   Q.    Approximately 11 years ago?

17   A.    That is correct.

18   Q.    Fair to say this technology develops pretty quickly

19   over time?  Eleven years is a long time in this field; is

10:19:37   20   that fair to say?

21   A.    Eleven years is long time, but the accuracy, the

22   regularity of the measurements didn't change since 2010,

23   it's still 78 meters.  And the noises and multi-propagation

24   effect don't change.  That's not equipment-related, that's

10:19:58   25   the nature of the radiofrequency propagation in the field.

```
 1   Q.   And you're familiar just generally with a couple

 2   radiofrequency engineering concepts that was discussed

 3   during your direct testimony, the term pie shape or pie

 4   wedge as it relates --

 5   A.   Yes.

 6   Q.   -- to sectors of a cell tower or cell-site?  You're

 7   familiar with that?

 8   A.   I am familiar with that.

 9   Q.   And you're also familiar with the terms "horizontal

10   plane" and "vertical plane;" isn't that right?

11   A.   I am familiar with horizontal and vertical plane.

12   Q.   I want to confirm a few things from your affidavit and

13   your testimony today.

14        First, Paragraph 26 of your affidavit:  To the best

15   of your knowledge, "the antenna radiation pattern, no matter

16   how scaled, was never used as an accurate depiction or even

17   an approximation, of the sector coverage and handoff areas -

18   no matter how scaled - in any books on RF engineering and RF

19   signals propagation."  Is that accurate?

20   A.   That is accurate.

21   Q.   And Paragraph 33, "To summarize, also for the record, I

22   never did, nor I ever will endorse throwing of some

23   unspecified radiation patterns on the ground as a valid

24   representation of the sector coverage, no matter which

25   mysterious algorithm is used to scale them."  Is that also
```

1    accurate?

2    A.    That is accurate.

3    Q.    Now, just a quick aside.  If you had the algorithm that

4    TRAX uses, you would be able to map and test the accuracy of

10:21:38  5    that software program; isn't that right?

6    A.    No.  I would be able to say if it has any basis in

7    science.  To test the accuracy, we would have to either test

8    it against RF propagation prediction, maps, or drive

9    testing, or maybe some third way.

10:22:03  10    Q.    Sure.  It sounds like you answer -- you answered my

11    question a different way.  You could test the reliability or

12    the accuracy of the TRAX software, correct?

13    A.    It could be tested.  You asked about algorithms, if I

14    move the algorithm, I could tell you why it's wrong or why

10:22:21  15    it can't be right, and what are the exceptions and all of

16    that, but algorithms are not disclosed, so I can't tell.

17    Q.    The last paragraph in your affidavit, Paragraph 50,

18    that I wanted to bring up, "Showing the antenna radiation

19    pattern in dB units as a covered area of a sector has no

10:22:37  20    basis in science."  Is that an accurate statement?

21    A.    That is an accurate statement.

22    Q.    So based on your testimony today and the affidavit,

23    it's pretty clear you don't believe antenna radiation

24    patterns can be used to approximate sector coverage or

10:22:54  25    handoff areas; is that correct?

1   A.   They are one of the many two dozen factors that came --

2   that play into determining the coverage, sector coverage and

3   border area throughout using them as the estimate.  And I

4   don't know how you would use vertical pattern for estimate

10:23:16   5   of anything.  It is not based on science.

6   Q.   You've previously been provided what has been marked as

7   Government Exhibit 100 by Mr. Tilton; is that right?

8   A.   I don't know what you're referring to, sir.

9   Q.   Did Mr. Tilton email you an exhibit that's been marked

10:23:40   10   Government Exhibit 100?  It's your, the report you drafted

11   in September.

12   A.   Oh, yeah, yeah, yeah.  Yeah, I have that, sorry.  You

13   mentioned the number.  I didn't know what you were referring

14   to.

10:23:51   15   Q.   I apologize.  It's the September 2018 report that you

16   drafted titled "Geolocation of Calls in the Charles Merritt

17   case in California."

18   A.   Yeah, yeah, yeah, I got that.

19   Q.   You drafted that?

10:24:05   20   A.   I have that available on the site, yes.

21          MR. McGRAW:  And I would move to admit that at this

22   time, your Honor, Government Exhibit 100.

23          MR. TILTON:  No objection.

24          THE COURT:  100 is received.

10:24:15   25          MR. McGRAW:  Thank you, your Honor.

1    By MR. McGRAW:

2    Q.    Let's turn to Page 19, the last paragraph on that page.

3    You write, "In figure --"

4    A.    Can you give me just a moment to pull that document

10:24:27  5    out?

6    Q.    Absolutely.

7    A.    Okay.  Page --

8    Q.    Page 19, the last paragraph.  And we are going to move

9    on to Page 20.  But starting on Page 19, you write.  "In

10:24:46  10   Figure 15, which depicts the radiation patterns of a typical

11   cellular antenna, we see that in this range of vertical

12   angles the antenna transmits largely outside its main

13   radiation lobe."  Correct?

14   A.    That is correct.

10:25:01  15   Q.    And then if we turn to Page 20, we see Figure 15 at the

16   bottom of that page, right?

17   A.    That is correct.

18   Q.    On the left, that is a horizontal plane of a radiation

19   pattern, correct?

10:25:18  20   A.    That is correct.

21   Q.    And on the right, a vertical plane of a radiation

22   pattern?

23   A.    That's also correct.

24   Q.    And if we turn to the appendix on Page 36, we see

10:25:36  25   Figure 32, and you write, "In RF engineering theory, it is

well known that radiation pattern of any antenna when
expressed in units of decibels, dB for short, can be very
well approximated by the so-called parabolic curve."  Isn't
that correct, sir?

10:26:00  A.   That is correct.

Q.   You go on in the subsequent paragraph to say, "Based on
the approximation and the known antenna azimuths from the
cell-site table, we can plot the radiation patterns of the
cell antennas that are next to each other on a cell site."

10:26:15  Is that right?

A.   Very, very well, yes.

Q.   So generally speaking, Dr. Jovanovic, you would agree
that using call detail records from wireless service
providers, based on the approximation and known antenna

10:26:31  azimuths, you can in fact plot radiation patterns of
cell-site towers?

A.   That is not what this is saying, sir.

Q.   But you would agree with that?

A.   I wouldn't agree with that because that is one of two

10:26:48  dozen factors that determines coverage.  It's not just --
it's antenna height, it's tower, transmit power, it's the
height, terrain elevation, it's RF, different -- very suburb
and urban, open field, and all of that.

Q.   If I'm understanding you correctly, you would consider

10:27:15  a number of different factors when mapping radiation

1    patterns of cell-site towers; is that right?

2    A.    I generally don't map radiation patterns of cell-site

3    towers.   In this example, in this case, there is one example

4    where I mapped as a pie shape, not this amoeba thing, an

10:27:45   5    area of the handoff, and I estimated the size of that pie

6    shape based on due diligence that's demonstrated in this

7    report.   I looked at the elevation, I looked at the antenna

8    height, I looked at whether -- it was in the desert, so that

9    didn't come into play and all of that.   So I never used

10:28:08  10    antenna pattern to estimate the coverage.

11    Q.    Fair to say, I think in that answer you said you would

12    have mapped it using the wedge shape or the pie shape; is

13    that right?

14    A.    No, I -- that was an example of hand-off overhead area

10:28:26  15    where I go further on next Page 33 and 34, I explain how you

16    can determine the area of handoff, angular size of the area

17    of handoff, and I estimated the length on the ground based

18    on the geography and elevation maps and antenna heights and

19    all of that.

10:28:54  20    Q.    I understand.

21    A.    I never draw --

22    Q.    Go ahead.

23    A.    I never put antenna patterns to represent the coverage

24    of the sector.

10:29:06  25    Q.    You certainly disagree --  You certainly disagree with

the conclusions that have been drawn in the TRAX software

for how it maps cell phone coverage or handoff areas; is

that fair to say?

A.   I disagree because they are wrong.

Q.   Okay.  And you would do it entirely differently, but it

is possible to map that type of data, right?  Considering

all of the factors that you've just discussed, it's possible

to do that?

A.   It's possible there are tools, I have propagation tools

which have been admitted to evidence in previous cases where

you take 20 or 30 different parameters for the mobile for

the cell, you get terrain elevation database, you get RF

plot data based on satellite measurements.  These are

software programs, thousands of dollars that cellular

operators use to design their network, and they use them

even when the network is underground and nobody -- if this

method works, you throw the antenna pattern and you scale it

without heights and terrain morphology and any other

information about the cell site, all of these guys would be

out of business by now.

Q.   And this was the type of prior work that you did, I

think it was for Newfield Wireless in 2007; isn't that

right?

A.   I did various things there, yes.  I was engaged in

geolocation project, and people who formerly reported to me,

some of them at least were engaged in drive testing to

calibrate those propagation tools, but that line of business

was not very smoothly, so I didn't really contribute much to

that part of the Newfield business.

10:31:08    MR. McGRAW:  Thank you very much, sir.  I having

nothing further.

Thank you, your Honor.

THE COURT:  Mr. Tilton.

THE WITNESS:  Mr. Tilton, can I --  Actually you

10:31:27 can't give me permission.  Your Honor, can I have three

minutes?  I need a bio-break at this point.

THE COURT:  We will give you ten, how about that?

THE WITNESS:  That would be even better.  Thank you

, sir, so much.  I'm sorry.

10:31:38    THE COURT:  All right.  No, that's quite all right.

I call it a bio-break sometimes, too, okay.

We will take --

THE WITNESS:  And my neck, and I take some muscle

relaxer dries me, makes me dry, my mouth, and I have to

10:31:57 drink water and then, you know.

THE COURT:  Fair enough.

THE WITNESS:  Thank you so much.  I'll be back in

five.  Thank you so much.

THE COURT:  You are welcome.

10:32:04    We will take a 10 or 15 minute break.  Thank you.

|  |  |
|---|---|
| | 1 |  MR. TILTON:  Thank you. |

```
              1              MR. TILTON:  Thank you.

              2              COURT CLERK:  All rise, please.

              3              Court is in recess.

              4        (At 10:32 a.m., recess.)

10:50:04      5        (At 10:49 a.m., proceedings continued.)

              6              THE COURT:  We are back on the record in U.S. vs.

              7        Reynolds.  Counsel and the defendant are present.

              8              Redirect, Mr. Tilton.

              9              MR. TILTON:  Thank you, your Honor.

10:50:14     10                   REDIRECT EXAMINATION

             11        BY MR. TILTON:

             12        Q.    Good morning again, Dr. Jovanovic.

             13              On cross examination, Mr. McGraw asked you about

             14        your affidavit in the Charles Merritt case.  I would like to

10:50:36     15        have you look at your own slide show again in Defense

             16        Exhibit QQ, on Slide Number 42.

             17        A.    I'm there.

             18        Q.    And is this an excerpt from your report, which is

             19        Government Exhibit 100?

10:51:01     20        A.    That is correct.  Except that I add dotted red lines.

             21        Q.    So you believe that Mr. Ray misunderstood this report

             22        or the TRAX software misinterprets it.  Can you tell me how

             23        that misinterpretation relates to what you have in

             24        Footnote 26?

10:51:29     25        A.    Okay.  I think this is the crux of the problem and
```

1    probably the reason the questions were asked on cross, which

2    were supposed to kind of indicate some inconsistency versus

3    my old report.

4         I did write here that the sector borders and

10:52:01   5    overlap areas, I don't mention that here, but given the

6    overlap areas are defined by antenna radiation patterns,

7    these are horizontal radiation patterns, but that relates

8    only on an antennas on the neighboring sector of the same

9    tower.

10:52:22   10         Basically if you have two antennas, one shoots like

11    this, the other shoots like that, and there is a point in

12    the middle on this side, this sector will take over on the

13    other side, the other side will take over.  And these

14    antenna patterns are precisely defined and they are steady.

10:52:42   15    But that applies only for the sectors that are borders

16    between sectors and the same tower.

17         Sectors between on cells -- on two different

18    towers, their borders are asymmetrical and they go zig-zag

19    any which way.  The reason for that is in the normal cell

10:53:10   20    towers, all sector antennas are a few yards away from each

21    other.  So when you are one mile away, you see all sector

22    antennas within an angle of 01 degrees or something like

23    that.  So the propagation part obstacles, forest, trees,

24    everything on that part is the same.  They are on the same

10:53:39   25    height, on the same antennas for the sector, are the same

tower.  They are normally in the same heights and all of

that.  So in that case -- in that case only you can use the

horizontal pattern to find the borders of the sectors and

overlaps between sectors and the same cell.

10:54:02    And I think that has been consistently

misunderstood or maybe even misrepresented because if this

endorses anything, it endorses the pie shape of both the

sector and the sector overlap areas and not the antenna

pattern, you know, of some amoeba form.

10:54:27  Q.   Thank you.

Mr. McGraw also asked you whether or not you could

have performed an accuracy test on this software.  Now --

Oh, go ahead.

A.   He did.  He did, yep.

10:54:44  Q.   Now, if something is opened up, an algorithm or a

program, to the scientific community and subjected to peer

review, is that one of the things that might happen?

A.   That's one of the things that might happen.

Q.   And you said that it would take you, in your estimate,

10:55:06  at least a year to do an accuracy test?

A.   I honestly don't believe the burden of proof is on me.

I was not aiming, you know, any specific numbers.  I just

said these numbers don't make sense to me.  I think burden

of proof is on those who make such statements.  So you know,

10:55:30  present drive test data or whatever, geolocation, how many

1    -- where the border was in the map that I created versus

2    whether on the drive test mobile handed off and all of that,

3    and then do thousands of such measurements, and then you can

4    do statistics and say 93 or 98 or 10 percent.  But I could

10:55:56   5    do it.  I mean if somebody hires me, I can certainly do

6    drive tests myself, and I can do such comparisons.

7    Q.   But that's something you would expect would be

8    subjected to peer review?

9    A.   Yes.  I mean you provide, you know -- this is raw data,

10:56:16   10   this is my statistic analysis, this is the results, you put

11   in the open and people can see if I made error in statistics

12   or if my drive test methodology wasn't good or something.

13   Q.   So people with similar scientific backgrounds, such as

14   yourself, could review it?

10:56:35   15   A.   That is correct.

16        MR. TILTON:  Nothing further, your Honor.

17        THE COURT:  Mr. McGraw.

18        MR. McGRAW:  No thank you, your Honor.

19        THE COURT:  All right.  Thank you.

10:56:42   20        All right.  That concludes the testimony.

21        Mr. Tilton, do you have any other proofs?

22        MR. TILTON:  We have no other proofs, your Honor.

23        THE COURT:  All right.  Thank you.

24        Rebuttal?

10:56:55   25        MS. SANFORD:  Your Honor, the government briefly

1    re-call Sy Ray.

2         THE COURT:  All right.  Thank you.  And we have

3    Mr. Ray connected.

4         Mr. Ray, I'm going to swear you in again, so if you

10:57:10   5    could raise your right hand, sir.

6                   SY RAY,

7    was thereupon called as a witness herein, and after having

8    been first duly sworn to tell the truth, the whole truth and

9    nothing but the truth, was examined and testified as

10:57:21   10   follows:

11        THE COURT:  Ms. Sanford, you may inquire.

12        MS. SANFORD:  Thank you.

13                   DIRECT EXAMINATION

14   BY MS. SANFORD:

10:57:24   15   Q.   Mr. Ray, I'm going to start by having you review some

16   of the slides prepared by Dr. Jovanovic.  Do you have a copy

17   of those slides?

18   A.   I do.

19   Q.   I would like to start by looking at Page 4, which shows

10:57:37   20   a list of technical references from the ZetX website.  And

21   Mr. Tilton --

22   A.   Correct.

23   Q.   Mr. Tilton went through this briefly.  This is

24   references Project BASTA, the SWGDE recommendations for

10:57:50   25   cell-site analysis, there is a link to a technical journal.

1    Why did you include these things on your website?

2    A.   So, we get a lot of questions in reference to using the

3    wedge shape, which was historically used for law enforcement

4    to map call detail records and then using the horizontal

10:58:09   5    plane.  And what we have done over the years, because we

6    have had a number of these challenges throughout the

7    country, is we put a website together, and it's open to the

8    public, because we are putting this stuff out there.  We

9    want people to be able to do some research on their own.

10:58:22   10   This horizontal plane, not only is actually accepted in the

11   scientific field, but it's published in multiple journals,

12   it's published in multiple papers.  And I'm still confused

13   because Dr. Jovanovic said he's never used it, but he's

14   published it in his actual case work as well.

10:58:38   15        I'm not getting into the ranging side of it with

16   these reference points.  What we are trying to say is that

17   if you are going to map these records, using a horizontal

18   plane is a better way to do it than the wedge shape.

19        And probably the most important thing, when it

10:58:54   20   comes to criminal justice, is it's exculpatory.  The

21   horizontal plane actually makes the area bigger.  And if you

22   look at some of the other slides in the appendix that Mr.

23   Jovanovic -- or Dr. Jovanovic included, you'll notice that

24   when he overlays the horizontal plane over some of the

10:59:10   25   sectors that he is representing was what kind of the more

accurate coverage should be.  The horizontal plane is

actually bigger.  That actually plays into that exculpatory

model that we are saying hey, yeah, we understand that a

center of the cone is likely where the device is at, but

10:59:27   there's other things that he didn't discuss such as

reflection.  The fact that I could be bouncing off of a

glass building in a city be behind the antenna and still

connect.  And we see this across the country on a regular

basis.  And the problem we were having is that when we did

10:59:39   drive tests, and just for the record, to date we have

conducted drive tests on over two million cell sites.  When

we have done that, we have never been able to put an exhibit

up on the map similar -- and just for reference so the Court

aware and kind of keep the record clear, I'm referring to

10:59:59   Mr. -- or Dr. Jovanovic's Slide Number -- give me just a

second here -- 27.

And you will notice on Slide 27 where he has the

cell cites, he has these nice clean pretty lines extending

from the cell sites showing that where one coverage stops

11:00:14   and another coverage begins.  And he is right.  I am really

confused about his report with Merritt, because he says in

Merritt that when you have cell sites that, or sectors

rather on the same tower, you can absolutely use the

horizontal plane to map those, even though he says it's not

11:00:32   scientifically feasible in other reports.  But when you look

1    at his Slide 27, and I see these nice pretty straight lines

2    extending between the sectors, not only does that go against

3    common sense of radio frequency, it goes against the report

4    that he wrote in Merritt.  And more importantly, we get back

11:00:49  5    to that exculpatory nature.  If I'm going to err I want to

6    err, on the side of the defense.  I want to make sure that

7    I'm including all possibilities for the defense.  I'm not

8    going to actually shrink the coverage down.

9          And if we go back to Slide 4, the reason we include

11:01:06  10   the scientific working group on digital evidence -- and I

11   think it's section 7.2, if I remember correctly, they are

12   using the pie shape.  And they explain that the pie shape is

13   the optimal coverage of a cell-site, but they also caution

14   using the optimal cell-site may not be the best advantage

11:01:28  15   and that you want to use something more in line with the

16   actual cell-site.  So all of the pages, it's our comparison

17   of the pie shape to the horizontal plane and that we are

18   showing that we are actually covering a more realistic

19   overlay with the horizontal plane.

11:01:43  20   Q.   And are you including the references to Dr. Jovanovic

21   here because you are saying he endorses TRAX?

22   A.   I don't know that Dr. Jovanovic, especially after

23   hearing his testimony today, has enough knowledge to make

24   that endorsement.  Even if he did, I would question it just

11:01:59  25   simply because when asked it he had access to it, if he

1       could test it, he was kind of hesitant.  So, in no way am I

2       referring to Dr. Jovanovic as a peer review of TRAX, of a

3       peer review of the product.  In none of this are you going

4       to see anything about me saying he endorses it.  What I'm

11:02:16   5   saying he is a really smart guy, he's got a Ph.D. in

6       engineering, and he's generated reports using the horizontal

7       plane contrary to what he said earlier that he's never done

8       that, he has.  It's in black and white.

9           I will agree with him -- I am confused, I'm sure

11:02:31   10   most of the Court is confused as well -- where he is saying

11      he's never used these, but in the report he very clearly

12      describes that he has used it.

13          When we actually say somebody endorses TRAX, we

14      will put enough TRAX to that person.  We allow them to

11:02:48   15   conduct a peer review, we allow them to actually publish the

16      results, and we have done that in the past contrary to what

17      Dr. Jovanovic said.

18      Q.   So what was the significance of the Charles Merritt

19      case and why is that included in these reference materials?

11:03:03   20   A.   So the Charles Merritt case occurred after the Thomas

21      Clayton case, and it wasn't about what Dr. Jovanovic was

22      going to testify to in the Merritt case.  I actually agree

23      with his report.  I agree with his findings a hundred

24      percent.  I don't have any issues with Dr. Jovanovic's work

11:03:21   25   on the Merritt case.  The problem is similar to this case,

1   in the Clayton case, which happened before the Merritt case,

2   Dr. Jovanovic said very clearly that using radiation

3   patterns, horizontal plane, whatever you want to call it,

4   the amoeba shape, has no place in science.  And he was

11:03:40  5   actually really mean to me in his affidavit where he really

6   called out the fact that I just simply don't have the

7   training, I don't have the education, and that the way that

8   I'm mapping these records has no place in science.  And then

9   lo and behold, about a year later, he generates a report

11:03:54  10   where he is using a horizontal plane.  I was contacted by

11   the San Bernadino D.A.'s office on that case, to very

12   similar to this case right now, offer rebuttal testimony in

13   the event that Dr. Jovanovic was to testify to talk about

14   the Clayton case and how he made these assertions, if you

11:04:12  15   will, during the Clayton case, that you can't use this style

16   of mapping.

17         And again, just to make sure we are all on the

18   record and making sure we are talking about the same cases,

19   the Clayton case has been reviewed all the way up to the New

11:04:23  20   York State Supreme Court of Appeals, and it's been upheld.

21   So that was a really big deal with the Merritt case.  Isn't

22   what his findings were, but to show kind of how he's gone

23   back and forth with some of his statements.

24   Q.  I would like to flip now to Slide 9 on his

11:04:37  25   presentation, which is titled by him "Impossible Sector

1    Shape and Size Estimates by TRAX."  Do you have that slide?

2    A.    I do.  I'm looking at it now.

3    Q.    It's unclear to me what is being depicted here.  What

4    is this slide showing?

11:04:57  5    A.    Well, it's showing two phone calls.  And if we were to

6    open up the Verizon call detail records, we could go to Row

7    121, we could see where the first call is being made, which

8    is the one on the right, the smaller shape that's inside the

9    bigger shape.  And in the second one is 122.  And there is

11:05:12  10    two issues here that, somebody of Dr. Jovanovic's experience

11    and background should absolutely understand the importance.

12    These are two separate phone calls.  In no way is that

13    possible to happen at the same time.  What is being

14    represented on the map right here that's missing is the

11:05:29  15    duration of time between the two calls.

16          We are not saying that the phone connected to both

17    of these cell sites at the exact same time and that now

18    somehow this is flawed.  What we are saying is that 121 --

19    call 121, the phone connected to a cell-site, and due to

11:05:44  20    other cell-sites in the area, this is the estimation we have

21    based on our drive test data around the country and

22    algorithm.  Whether it's a few seconds, a few minutes, an

23    hour later, the phone then connects to the cell-site

24    represented here by 122.  Without knowing that time, there

11:06:00  25    is really nothing to discuss here about the accuracy.

1          And I can probably clarify, too, that there was an

2     elevation profile in association with that that was listed

3     on Slide Number 31.

4          The problem with this elevation profile, and it

11:06:18  5     actually really shows why that second one is so much bigger,

6     is Dr. Jovanovic actually just drew a line between the two

7     cell-sites and showed an elevation profile.  He didn't draw

8     lines along the azimuths of those cell-sites to see how the

9     elevation profile matches in different areas.  For example,

11:06:37  10     if we go back to the slide you were just referring to, which

11     is Slide 9, the range that's bigger, the reason that one is

12     bigger is that there is actually an incline to what you're

13     looking at here, to the left of that black line that extends

14     from the cell-site, which is the azimuth, and there is areas

11:06:56  15     to the left that absolutely could be covered by that

16     cell-site.

17          And then on the smaller one, the problem there is

18     that you have some other cell-sites directly in front of

19     that azimuth line across the river.

11:07:07  20          In TRAX, the algorithm we use, which I did describe

21     in original testimony, takes into account where cell-sites

22     are positioned directly to or within or outside of that

23     azimuth line.

24     Q.    Thank you.

11:07:23  25          Now, looking at Slide 15 of his presentation -- and

           1    really I kind of want to refer to Slides 15 and 16.  This

           2    cell-site 228-501, he says that -- he doesn't know where

           3    that's coming from.  Were you able to locate that cell-site?

           4    A.    Yes.  So I should probably start by pointing out some

11:07:55   5    glaring issues here.  Number 1, on Slide 15, if you look at

           6    the P column, P as in Paul, and it gives you the channel

           7    type -- I'm not going to get crazy technical here, but

           8    basically notice that that's all 1xEV-DO or 1xRTT Traffic.

           9    We are mapping an LTE site, and we are looking at a 3G, 2G,

11:08:17  10    or in some cases potentially even a 1G cell-site list.

          11          So Number 1, I haven't seen the bigger cell-site

          12    list, but the screen shot here in no way represents, nor is

          13    it what I would look for, to identify the cell-site that he

          14    is questioning, the 228-501, because it's an LTE site.  We

11:08:35  15    need to look at the LTE site.

          16          Now, I saw this, the issue with this about 15

          17    minutes before the hearing, so I haven't had a lot of time

          18    to prepare, but I did run some records.  And we archive

          19    everything that our system sees, and I can tell you that

11:08:49  20    cell-site 228-501, not the cell 501 with the market I.D. of

          21    228, but the entire Number 228-501, we have had uploaded

          22    into our system by law enforcement records directly from

          23    Verizon 35 -- or I'm sorry, 32 different times.  The first

          24    time in 2016, the last time in 2020.  We have also had an

11:09:12  25    upload from the FBI's database what they refer to as the

1    CALEA database, that also shows the cell-site.  There's

2    absolutely no doubt that this is 228-508, we have seen it a

3    number -- or 501 rather -- we have seen it a number of

4    times.  It looks like we've mapped it over 75 times since

5    2016.

6         And you know, the other piece of this, and I

7    checked this during the original testimony this morning, all

8    you have to do, and reasonably like Google Earth, is zoom

9    into the tower.  You can see that the tower is located

10   there.  You can actually go into street view and see the

11   entire tower.  You can see how it's configured.  You can see

12   what direction the antennas are pointing.  So any time there

13   is a concern of hey, are we dropping this lat-long in the

14   right spot, it's as easy as zooming in and looking to see if

15   there's a cell-site there.

16   Q.   Now, in his affidavit, Dr. Jovanovic makes some issue

17   -- takes some issue with the fact that you use TDOA versus

18   TOA.  Can you talk briefly, explain to the Court what the

19   difference between those two terms is?

20   A.   Yes.  And I want to be very respectful here, and I've

21   said this in the video that he referred to earlier, I think

22   that Dr. Jovanovic is a very smart guy.  I think he's done a

23   lot of great work with cell phone records.  Obviously he's

24   very well educated in his field.  I think what is happening

25   here is the lack of experience directly related to working

1   with multiple carriers' phone records in 2020 or 2021.

2           Yes, we can argue about the technical terms of TOA

3   and TDOA all day long.  What Dr.  Jovanovic probably doesn't

4   realize is even the phone companies have titled these

11:10:54   5   reports TDOA reports.  There are certain reports of this

6   technology that when you open it, at the top of the page, it

7   actually says "TDOA."

8           And the other thing I think he's mistaken on is

9   when we get these reports, it is the cell companies

11:11:08   10   measuring the distance from the phone to multiple towers at

11   the same time.  Now, a lot of times the reports that law

12   enforcement gets will only show one tower or the primary

13   tower's measurement.  But it is the measurement of multiple

14   towers at the same time.  There's a lot of Verizon reports

11:11:27   15   that we can actually go into the report, it's about 220

16   columns wide, and we can see where multiple cell-sites

17   connected to the cell phone in the same millisecond and

18   receive measurements, and that is absolutely what is called

19   TDOA.

11:11:43   20           So just for the sake of argument, when the phone

21   companies are calling it TDOA, the reports are actually

22   titled TDOA, we are going to call it TDOA.

23   Q.    TDOA also what has been referred to in some of the

24   materials as RTT data?

11:11:57   25   A.    A hundred percent.

1    Q.    And so that is where we see -- in this instance, we see

2    a line from a tower with an arc showing the distance from

3    the tower to that phone along that arc; is that correct?

4    A.    That is correct.

11:12:19    5    Q.    Okay.  I want to touch briefly now on two things that

6    we covered when you testified originally just to make it

7    clear now that Dr. Jovanovic testified.

8          First, you talked last time about a software update

9    and how that changed what TRAX was calculating as far as

11:12:38    10    handoff areas?

11    A.    Correct.

12    Q.    And we see in Slides 10 and 11 that Dr. Jovanovic

13    prepared a change in one of those handoff areas following

14    that update.

11:12:54    15    A.    Correct.

16    Q.    In fact, the area becomes much larger after the

17    software update.

18    A.    That is correct.

19    Q.    What is calculated differently now that we see this

11:13:04    20    change in results between this -- on this same call with

21    this same cell-site?

22    A.    Prior to the update, which is Slide 10, we were looking

23    at towers individually.  So we would look at a tower and we

24    would see how that tower is placed with other towers in the

11:13:21    25    area.  And we were estimating a general coverage area based

on what we have seen around the country.  The problem that

we saw or -- and we knew that was there, in certain

situations in this case the cell-sites to the north, the

cell-sites to the east of this tower that's represented in

11:13:41  -- on Slide 10 are really close to the cell-site.  So when

you look at it that way, the coverage area looks like okay,

it would be small because there is a lot of other cell-sites

in very close proximation.  However, when you look at the

azimuth of the cell-site and the direction it points, what

11:13:55  we found is there were no other cell-sites directly along

that azimuth line.

So Slide 10 represents when we were estimating size

just, based on tower locations and its proximity to other

cell-sites.  We kind of had a breakthrough in all of our

11:14:09  drive test data -- and again, I'm going to agree with

Dr. Jovanovic where he said yes, he could peer review this,

but it would probably take him a year, and someone is going

to have to hire him, and he doesn't think it's his burden,

and I agree with that.  And I think his year is a really

11:14:24  aggressive plan.  It took us seven years, and we have done

millions of drive tests to do this.  And what we have found

is, we can now calculate these sizes based on the sector

itself, but more importantly the azimuth of that sector and

how that correlates with other cell-sites in that area.  So

11:14:39  in network planning, when we have gaps between cell-sites on

1    one side of the cell tower and we have other cell-sites very

2    close to the north side of the tower, we can now adjust for

3    that.

4         And again, I want to fall back to what I said

11:14:50  5    earlier, this is exculpatory.  We have increased the size of

6    the coverage area.  We're actually saying there is more

7    probability that that phone is in different areas than what

8    we used to.  We want to err on the side of being able to

9    come into a hearing like this and say we feel very

11:15:05  10   comfortable, at this point 95 percent, that that phone is

11   inside the blue-shaded area at the time it connected to the

12   tower.

13   Q.   When you say at this point 95 percent, you are talking

14   about after the software update?

11:15:16  15   A.   That is correct.

16        And Dr. Jovanovic pointed out a -- on our website

17   where we have 95 percent, but if you will notice, there's

18   more to that statement on our website.  We are talking

19   specifically cell-site mapping based on call detail records

11:15:30  20   from tower and sectors.  We map a lot of other data, and in

21   all of other our data when we've ran tests, we do see that

22   98 percent accuracy.  When we're talking specific to sector

23   data, and I thought I made that very clear in my original

24   testimony, it sits right about 95 percent.

11:15:47  25   Q.   And before you were doing the analysis, looking at

1    sector data as opposed to just tower density in a certain

2    areas, what was your estimate of your accuracy?  I think

3    from last time as I recall was over 80 percent accurate.

4    A.   Yes, depending on the environment, rural, urban, yes,

11:16:10   5    we would be about 80 to 85 percent.  So we found this was a

6    pretty dramatic increase.

7    Q.   Now, Dr. Jovanovic testified on direct that proprietary

8    by definition means something is not peer reviewable.  When

9    you say that TRAX is proprietary, do you mean it is not peer

11:16:32  10    reviewable?

11    A.   No.  That's not what proprietary means.  Proprietary in

12    the business world means that if you take my algorithm and

13    you tried to copy it and you tried to sell it, I'm probably

14    going to sue you if you make money on that, because we spent

11:16:46  15    a lot of time and effort building it.  Proprietary means we

16    own it.

17         We have released our algorithms.  We have allowed

18    them to be peer reviewed.  We have allowed them to be

19    published.  There is another Ph.D. in the field, his name is

11:16:58  20    Filipo Sharevski.  He actually has a cybersecurity Ph.D.

21    from Purdue, he is a current professor at DePaul.  We opened

22    up our entire system, we gave him free access for over a

23    year.  He tested our system, he wrote about our system in a

24    book, it's been peer reviewed.  And his conclusion was for

11:17:15  25    both text message and voice CDRs as well as for packet

1    services.   The TRAX tool also enables animated

2    representations of the service activity in place and time

3    which is a great feature for both analysis and

4    interpretation and courtroom evidence presentations.   We

11:17:31  5    have been peer reviewed.   We have had a Ph.D. crack open the

6    hood and actually look at how we are doing this stuff.

7    Q.   I'm going to ask you to --

8    A.   Just for the record to -- I'm sorry, I probably should

9    have named the book.   The book is called Mobile Network

11:17:45  10   Forensics, Emerging Research and Opportunities.

11   Q.   And I would like you do a favor for the Court Reporter.

12   Can you spell the name of that author?

13   A.   Yes, and I probably butchered some of the pronunciation

14   and I apologize.

11:17:57  15        The first name is F, as in frank, i-l-i-p-o, and

16   the last name starts with S, as Sam, h-a-r-e-v as in Victor,

17   s-k-i.

18   Q.   So if you're willing to tell what the algorithm is so

19   that it can be peer reviewed, can you briefly, and in

11:18:20  20   laymen's terms, tell the Court what your algorithm is?   What

21   is the algorithm that TRAX uses to determine these handoff

22   areas?

23   A.   I can.   And in fact, if the Court will allow me to

24   share my screen, I can actually overlay it within a Google

11:18:39  25   -- in Google Earth and make it very clear to see.

Q.   Will you do that, please?

A.   Give me just one second.

Okay.  Hopefully it's there.  You should be able to see Google Earth with Grand Rapids.

11:19:02  Q.   Give it a second.  Okay.

A.   So I'm going to put one of our coverage overlays on the map with the cell tower icon.

And earlier I was saying one of the reasons we really like Google Earth is the ability to zoom in like

11:19:18  this.  And if I remove that overlay that I just put in there, we can actually see that this is a cell-site right here that's located on the top of a football stadium.  And so whenever there is a question of hey, is that the correct lat-long, very easily I can go down into street view and I

11:19:36  can actually look at this giant cell-site that's located right on top of the lat-long that was given.  So whenever there is an argument that somehow lat-long is wrong, it's so easy to confirm that there really isn't much reason to spend any time arguing that.

11:19:53  But if we get into the algorithm -- and there's a couple things that I'll put on the screen here.  So what we look at is other cell-sites -- and I apologize, I'm going to have to load one other file here.  I'm going to load all of the Verizon cell-sites in Grand Rapids in this general area.

11:20:16  When I said earlier, you'll see gaps, you are going to see

1    the network planning.  There is reasons to have a lot of

2    cell-sites in some areas and not so many cell-sites in

3    another area.  And when you look at this particular

4    cell-site, you'll notice how right down the azimuth line,

11:20:32  5    that strongest line, there is a gap, and that's why we have

6    to extend that range a little further.

7         What we found after reviewing millions of drive

8    tests or data from millions of cell-sites from our drive

9    test scanner is we were able to kind of reverse engineer,

11:20:49  10   that if we took a cone, and a cone that looks basically like

11   this -- and I made it short -- but we can extend the cone 60

12   miles programmatically when we look at this.  What I can do

13   with that cone is I can start to measure each cell-site or

14   the closest cell-sites that are popping up within that cone.

11:21:05  15        So this first one is at 1.72 miles.  The second one

16   is at 2.64 miles.  The third one is at 3.46 miles.  We take

17   those and we average them.  So in this case, if I average

18   them, the average is 2.6 miles.  And then we have a little

19   model here, right now we are using .97.  If we take the

11:21:27  20   average and we times it by .97, we get 2.52 miles.  And if

21   we were to measure this distance right down the azimuth

22   line, it's at 2.52 miles.  I have no doubt that you're going

23   to have people like Dr. Jovanovic say yeah, I don't know

24   that that's scientifically accurate, because you are talking

11:21:46  25   about a very academia, very sterile way of looking at

1    cell-sites.

2         What we are saying is when we go out into the field

3    and we take our cell-sites that we have mapped, you know, 2

4    million of them in the database at the time, we go out and

11:21:58  5    we get the RTT, the TDOA type records where I think we have

6    a database of about 25 million of them, and we start to do

7    an algorithm where we say hey, programmatically have we ever

8    seen a connection to this cell-site beyond 2.52 miles, and

9    the systems comes back and says, no, we've seen some about

11:22:15  10   2.5, we've seen one at 2.51, but we've never seen one beyond

11   2.52, that's how we get the accuracy rating.  And we were

12   shooting for the mid to high 90s, so we started at like .92,

13   and we had some of that data coming back that it just wasn't

14   accurate, so we expanded it.

11:22:32  15        Now am I saying that this phone -- that this

16   cell-site literally covers everything that you have in the

17   shape here.  That's not what we are saying.  And I think

18   that's what Mr. Jovanovic is misrepresenting or

19   misunderstanding what our system is doing.

11:22:46  20        In 2021, there are cell-sites that cover 200, 300

21   meters.  Like you go into a college campus, very small

22   coverage areas.  You go to a rural location, and we have

23   mapped a connection and have actually been able to maintain

24   a voice connection at over 60 miles.  So as an investigator

11:23:02  25   for court, for any other reasons, when it comes to the

             1    criminal justice side of this, we have to be able to

             2    represent the average size saying hey, there is a lot of

             3    variables coming in here, elevation, tower height, just like

             4    Dr. Jovanovic said.  Water will have a big impact,

   11:23:20  5    buildings, the reflection, of any type of trees, you know,

             6    all of that stuff comes into play here.  So what we do is we

             7    look at the country overall and we say, is there some way we

             8    can capture all of this.  And if we're slightly big, so be

             9    it, let's make sure that we cover that whole area.  And

   11:23:35 10    that's where these ranging data comes from.

            11         There is a second piece to this.  We also tell

            12    people all the time, You can drive test this data.  We own

            13    drive test scanners, we send them out around the country, we

            14    do a lot of drive testing.  We store all of that

   11:23:49 15    historically.

            16         So there is ways to test it, it is not some secret

            17    sauce that we keep behind closed doors that nobody can see.

            18    I have explained this exactly what you see on the screen

            19    here a number of times.  And we encourage people to go out

   11:24:04 20    and test it.  If somebody goes out and tests it, and says

            21    hey, we found some problems, that's great for us.  It opens

            22    the door for us to figure out better ways do it.  And I have

            23    no doubt that in the future we can improve upon what we are

            24    doing now.  But for the time being, we have found this is a

   11:24:18 25    very accurate means to give law enforcement personnel

1    practitioners a very general way to estimate what that

2    coverage areas looks like.

3    Q.   Mr. Ray, can you preserve a copy of that screen shot

4    that showed the algorithm and send it to me?

11:24:35    5    A.   I can.  Do you know what that number it would be?

6         MS. SANFORD:  Yes, your Honor.  I would like to

7    move to admit that as Exhibit 101 for purposes of the

8    record.

9         MR. TILTON:  No objection.

11:24:44   10         THE COURT:  Received.  101.

11    BY MS. SANFORD:

12    Q.   I just want to finish with something I think you sort

13    of just addressed.

14         Dr. Jovanovic talked about a lot of things that

11:24:53   15    need to be accounted for when you're mapping cell-site

16    location information.  Radiofrequency patterns is one thing,

17    but the antenna strength, the antenna height, elevation,

18    geography, whether it's a city or a suburb or an open plain,

19    all of those things.  And what you are saying is TRAX

11:25:10   20    doesn't necessarily consider all of those factors in each

21    cell-site, but by it accounts for those with its error rate;

22    is that correct?

23    A.   That is correct.  And there is some easy ways that we

24    can misrepresent a handful of the things that we see in the

11:25:28   25    exhibits in the appendix that Dr. Jovanovic provided.  And

1    you'll notice like -- and I'm looking again at Slide 27,

2    where he has very defined areas of like color where, okay,

3    this sector is going to cover this area.  What we found in

4    drive testing, especially in 2001.  And understand, drive

11:25:48   5    test data from 2010, drive test data from 2015 is very

6    different than what we see in 2021.  With the 4G

7    technologies we see sharing between sectors and cells much

8    more frequently.  There is no such thing as a clearly

9    defined pattern such as like our horizontal plane.  There is

11:26:04   10    going to be holes covered by other cell-sites, but at the

11    same time, it can expand further in this case, that example

12    I gave was like two miles, so again, you can have a

13    cell-site, three cell-sites, four cell-sites providing

14    coverage to the exact same area.  And we have to figure out

11:26:23   15    a way that we can actually present that when we are doing

16    our estimations.  And over the years, looking at all of the

17    different cell-site data that we have gathered, this is the

18    best way we have found to do it.  And it has been accepted

19    -- I get this question all the time:  Has it been accepted

11:26:37   20    in the relevant scientific community?  It's hard to define,

21    because is Dr. Jovanovic the best person to say he is the

22    relevant scientific community.  Has he ever gone out in the

23    field and tried to find a mobile device based just off phone

24    records and nothing else?  Has he gone out in the field and

11:26:52   25    tried to recover evidence?  Has he gone out in the field and

1    tried to recover a buried body?  We have done this thousands

2    of times, and we are accurate, we are recovering evidence,

3    we are finding bodies.  And when we get this question:  Has

4    it been accepted in the relevant scientific field, we have

11:27:08  5    had Daubert, Frye, Kelly, Shreck, you name the hearings

6    around the country, we have had them over and over again,

7    and it's been accepted time and time again in every state

8    it's been challenged.  So yes, it has been accepted in the

9    relevant scientific field.

11:27:22  10          MS. SANFORD:  I have no further questions.  Thank

11    you, Mr. Ray.

12          THE COURT:  Mr. Tilton, you may inquire.

13          MR. TILTON:  Thank you, your Honor.

14                    CROSS EXAMINATION

11:27:33  15    BY MR. TILTON:

16    Q.    Good morning, Mr. Ray.

17    A.    Good morning, sir.

18    Q.    The software update we have talked about occurred in

19    April 2020?

11:27:50  20    A.    Roughly, correct.

21    Q.    You testified in other cases prior to April 2020,

22    right?

23    A.    I have multiple times, correct.

24    Q.    When you testified prior to April 2020, you claimed

11:28:03  25    that the accurateness of the TRAX software was above 90

1    percent correct?

2    A.    If you give me which case, we can talk about that a

3    little bit more, but I've probably testified a hundred times

4    prior to that.  So what case in particular are you

11:28:18    5    discussing.

6    Q.    Let's start out, in those a hundred times where you've

7    testifying TRAX was more than ninety percent accurate?

8    A.    There is no way I can give you a number of how many

9    times.  The reason I'm asking this is I suspect that the

11:28:33   10    transcripts that you're reading from, if you gave me the

11    case, you are going to find that we did a drive test.  So

12    this is different where a crime happens, we're contacted

13    early in the investigation, we go out and do a drive test.

14    We then take the forensic exam of the network from our drive

11:28:48   15    test and we compare it to the mapping that we created, and

16    now we can absolutely say it's 90 percent accurate, it's 92

17    percent accurate, it's 88 percent accurate.  You are going

18    to find different variables around the country.  The reason

19    I'm asking if you can give me a case, I need to know if we

11:29:02   20    actually did the drive test.  And I suspect you're referring

21    to the Clayton case, and I can tell you in the Clayton case,

22    I personally flew out there and did the drive test myself,

23    so I was able to tell exactly what the accuracy was.

24    Q.    In cases where there was no drive testing completed,

11:29:18   25    what would you have testified the accuracy would have been?

A.   It depends on, again, what year.   The other thing is do

we have some other corroborative data.   What I mean by

corroborative data is, let's say that our suspect is using

an Android device and we have Google location data.   So now

we can actually look at Google location lat-long, many times

within accuracy, and I can compare it to the phone records.

And now we have two different sources of data.   I can say

Okay, we see this phone drive across Colorado and we have

these phone records, but at the same time, we have this

lat-long.   There is times I may have told the Court it's a

hundred percent accurate.   In fact, we have so many

different sources of data that are coming down in the exact

same area, it's mathematically impossible for it not to be

accurate.   So again, when we talk general cases, you are

going to have to give me a case and what other supporting

data we had on top of TRAX.

Q.   What I'm asking about is before you used any of that

corroborative data, what was the accuracy rate of TRAX

before April 2020?

A.   Doesn't make sense.   Without using corroborative data,

there is no way I can tell you what accuracy is.   Whether

that corroborative data is, going back towards our drive

test database, whether that corroborative data is looking at

RTT, whether it's looking at Google.   If you're asking me to

commit to the accuracy of prior testimony without looking at

1    corroborative data.  The other thing I can tell you is it's

2    few and far between that I would ever testify to accuracy

3    without seeing corroborative data.

4    Q.   So is the 95 percent rate that you are saying TRAX is

11:30:56    5    now accurate to after the software update, is that with or

6    without corroborative data?

7    A.   So we are talking about two different things, and let's

8    make sure I'm super clear on this.

9             You are talking about my testimony and you are

11:31:10    10   talking about our cell tower database, so I'll break these

11   into two components.

12            Our cell tower database is maintained

13   programmatically, and what that means is we can

14   programmatically look at all of ranging we have associated

11:31:22    15   with ever sector in the United States, about 25 million of

16   them, and we can compare that to drive test data, we can

17   compare that to the TDOA data, and we can say how many times

18   do we see that a phone connects to a cell-site outside of

19   the range that we are predicting.  And when look at it

11:31:40    20   programmatically within our cell tower database, it's

21   roughly at 95 percent.  I think varies from month to month

22   because we get new cell-sites that come in, you know,

23   sometimes it could be 94.6, sometimes it might jump up to

24   like 96, but it's roughly 95 percent.

11:31:56    25            If you are talking about my testimony, that's a

1    whole different thing.  My testimony is where I review a

2    case, I look at the data, and then I look at -- or

3    corroborative data if we have it, but I'll also start to go

4    in and I'll look at things like elevation, I'll look at

11:32:10  5    things like bodies of water, where do we have structures,

6    what does the, you know, the foliage in that area look like.

7    In this case, we have RTT data on top of the call detail

8    records, so there is some corroborative data just from the

9    RTT data alone that we can pull and I can look at here.

11:32:28  10        If you're asking me about accuracy statements in

11    court, many times that's going to be after I've done a full

12    analysis and looking specific to that case.  95 percent is

13    the cell tower database across the country.  My testimony is

14    going to be specific to a case based on whatever information

11:32:42  15    and data is available for that case.

16    Q.   Let's talk about this case specifically, because you've

17    testified -- this is your second time testifying, and the

18    data in this case was run both before the software update in

19    April 2020 and after the software update in April 2020,

11:33:02  20    correct?

21    A.   The agency that ran it, correct.  I did not run it.

22    Q.   I couldn't -- we had a connection issue there, and I

23    couldn't hear your answer.  Could you repeat the answer?

24    A.   I believe the Grand Rapids Police Department ran the

11:33:20  25    data at those two time frames.  I personally have not ran

1     the data for those two time frames.

2     Q.    Do you know what the accuracy would be of the data that

3     was presented that was run through the TRAX program before

4     April 2020 in this case?

11:33:36   5     A.    I don't know, and I quite honestly I wouldn't look at

6     it.  I'm not testifying to that data.

7     Q.    What about the TRAX data that was run after April 2020,

8     do you know what the accuracy is of that data?

9     A.    I can tell you the accuracy that we have seen across

11:33:51   10     the country from the tower database is roughly 95 percent.

11     I can tell you that when I compare the RTT data to our

12     ranging data, we are hitting closer to 100 percent based on

13     what I have available to me.

14          And let me explain this to you so I don't lose you

11:34:09   15     on this.  If I have a horizontal plane on the screen from a

16     phone call, and TOA data is different than phone calls.  And

17     then I map 30 seconds after that phone hangs up, there is a

18     TDOA phone call, and I have the max range of the horizontal

19     plane at two and a half miles, but 30 seconds after that

11:34:26   20     call, there is a TDOA hit that is six miles away.  That

21     would be an error rate, right, because I'm showing the voice

22     call within 2.5 miles, but Verizon is getting a measurement

23     showing it's six miles away.  We can use that data to help

24     corroborate this data as well.  Remember, we have multiple

11:34:45   25     layers of data.  When we overlay them together in this case,

they line up.  So you know, I'll never come to court and say

a hundred percent, because there is always things that can

be wrong, there's always flaws.  I'm not seeing anything

that causes me any concern that the current data we are

11:34:59  talking about, the post update data, is inaccurate or that

we have issues with it or something that it cannot be relied

upon.

Q.    So you have corroborated what was run in TRAX after

April 2020 in this case specifically?

11:35:15  A.    Based on the information I have, yes.

        Now I, with that said, I know nothing about this

case.  I don't even know what the crime is, I don't know any

of the parties of the case, I don't know the known

information of houses and where maybe witnesses saw

11:35:30  different people.  So just as long as everybody understands,

based on the information I have been given, yes, I have

corroborated it to the best of my ability.

Q.    What information were you given?

A.    The phone records.

11:35:45  Q.    So you've only used the phone records to corroborate

what the TRAX software outputted?

A.    And the accuracy of the phone records, yes.

Q.    What would you normally expect that someone would use

to corroborate the TRAX output?

11:36:09  A.    It depends on what you're mapping.  We support over 850

1    different types of data.  It's kind of a broad question.

2    Q.   I'm talking about in the type of data in this case,

3    what could be used to corroborate it?

4    A.   As I explained before, the TDOA.  The RTT can

11:36:27   5    definitely help.  I believe there is some AT&T NELOS that

6    could definitely help.  And then I don't know what other

7    case specifics could be used.  Maybe there is surveillance

8    video, there is an LPR reader, there is known information

9    about where a particular individual was seen.  There is

11:36:44   10   other factors that could --

11   Q.   How about a drive test?

12   A.   Drive test could absolutely be used.

13   Q.   And that's something you would normally would do?

14   A.   Well, it's done.  I can't say normally.  You have to

11:36:59   15   understand we have 25 million sectors in the database.

16   There is a lot of crime in the United States.  I don't know

17   that I can say that my drive test scanner can normally be

18   used to map all of those.

19   Q.   I would like you to go to Defense Exhibit QQ, which is

11:37:15   20   Dr. Jovanovic's Power Point presentation?

21   A.   I'm sorry, what number?

22   Q.   We are going to go to Pages 10 and 11?

23   A.   Okay.  I'm there.

24   Q.   And so my question to you is:  Page 10 is a horizontal

11:37:36   25   plane that was created before the TRAX software update; and

1    Page 11 is a horizontal plane that was created after the

2    software update.  Can you tell me what the accuracy of each

3    of those horizontal planes would be?

4    A.   Well, I can't tell you the accuracy of the prior to the

11:37:56  5    update, because I don't have drive test data from that

6    specific sector to get into where it exactly falls.  What I

7    can tell you is based on everything we have seen around the

8    country, I would say the accuracy, as I've been saying the

9    entire time, is around 95 percent on Slide 11.

11:38:11  10         And if I can share my scene again, I'll show you

11    how our system actually caught the network planning that

12    there is a big gap between cell-sites for that sector and

13    our system actually caught that, and that's why we increased

14    the size.

11:38:27  15    Q.   I'm fine if you want to share that.

16    A.   If you'll give me just a second, I've got to make sure

17    I get the actual site we are dealing with here.

18         Okay.  I still have it listed as Exhibit 101.  If

19    we need to change, let me change that before I publish just

11:39:06  20    so it's not confusing to anybody.

21         And let me know when you can see my screen.

22    Q.   We can see it.

23    A.   Okay.  We are talking about this cell-site right here

24    the 228-548.  And if you can't see that, what I'm going to

11:39:37  25    do is I'm going to draw a line extending from the cell-site

1    up to the north.  You see there is an elevation profile that

2    came up underneath that there.

3         And what I want you to see is like there's a

4    cell-site right here that's basically half a mile away

11:39:55  5    north-northeast.  There is a couple cell-sites kind of off

6    to the west, yes, the west-northwest.  Those are about a

7    half a mile as well.  Then you get a whole bunch right down

8    here in the downtown area.  So hypothetically, if we just

9    start talking about how the coverage would look from

11:40:10  10    different antennas.  Obviously to the west and to the north

11    of this cell-site, you are going to have smaller coverage

12    areas because of the approximation of other cell-sites.

13         Now, if we look at that particular sector that you

14    referred to, the azimuth is generally along the yellow line

11:40:27  15    here that I've marked.  Notice the gap.  So when we look at

16    the coverage of an antenna that's pointed to the west or an

17    antenna that's pointed to the north of the cell-site, common

18    sense says it's got to be smaller.  We do a drive test, it

19    is going to prove that it has to be smaller.  But when we

11:40:42  20    look at a cell-site that's positioned kind off to the

21    south-southeast, notice that that distance is almost, it's

22    1.5 miles, so we have gone almost, what, two and a half

23    times the distance of the other sites.  And if I go back to,

24    or if we go back to Mr. Jovanovic's slide, I think he

11:41:03  25    estimated that we increased two and a half times.  What that

1    tells me right off the bat is that is a form of validation

2    for me.  When we look at hey, we are positioning these other

3    sectors at a half mile or less because of the environment

4    that we are seeing these cell-sites, but now we have

11:41:20    5    identified that this sector is pointing a direction where

6    there is a gap in other towers, and we actually see an

7    increase of two and a half times, I think that it kind of

8    speaks for itself there.

9    Q.    Okay.  So we are talking about, when that software

11:41:35   10    update occurred, we are talking about sort of a different

11    method, right?  I think you said prior to 2020 we were using

12    sector and azimuth, and then that changed in 2020; is that

13    correct?

14    A.    No.  It's actually backwards.  We were just looking at

11:41:51   15    the cell-site locations prior to that.  Now we actually look

16    specifically at individual sectors and azimuth.

17    Q.    It's a pretty significant change.

18    A.    It was a major change for us, it was actually a really

19    good advancement for us.

11:42:07   20    Q.    Now, you mentioned, you talked about peer review on

21    direct examination.  And what does peer review mean to you?

22    A.    Correct.

23          Peer review is when somebody who has training and

24    is educated in the field reviews a work product or some type

11:42:30   25    of an exhibit similar to this to simply review it and see,

1   you know, is there accuracies, is there anything missing, is

2   there something we need to expand on, is there further

3   investigation that's required.  It can be a number of

4   different things.

11:42:42   5   Q.   So you don't mean a peer review in the scientific sense

6   that it was published in a scientific journal?

7   A.   If you can find me a peer review in a scientific

8   journal that explains how to review all of the evidence

9   within a homicide case to make sure that it was properly

11:43:00   10   aligned within call detail records and other types of

11   geolocation evidence, I would be more than happy to cite it,

12   but typically we are not in the business of publishing

13   things that could be used to actually commit crime.

14       So no, I'm not going to get into a public document

11:43:19   15   and explain how I can use evidence in a homicide to help

16   solve a homicide.  That's common sense.  We are not going to

17   peer review all of the different ways that we -- methods and

18   techniques we use to solve homicides in a scientific

19   journal.  It's not the point for it.  I don't even know if a

11:43:39   20   scientific journal would actually publish it, but I will

21   absolutely use other experts in the field, whether they are

22   an expert in homicide investigations, whether they are

23   experts in geolocation data, whether experts in cell phone

24   reports, and a lot of times I'll use multiples.

11:43:56   25   Q.   You mentioned one source of scientific peer review,

1    that was Dr. Sharevski's book?

2    A.    Correct.

3    Q.    And Dr. Sharevski in his, is not -- he is a Ph.D., but

4    he is not someone who teaches about radiofrequency

11:44:17   5    propagation, correct?

6    A.    Well, he is a professor at DePaul who specializes in

7    network communications, so I don't know what his syllabus

8    looks like, I don't know what his teaching capabilities look

9    like, but he has a Ph.D. and he is a professor at a well

11:44:33   10    known college, so I think it's possible he absolutely gets

11    into radiofrequency.

12    Q.    But you don't know for certain?

13    A.    I've never been to any of his classes, no.  I know that

14    he reached out to us, because he was specifically interested

11:44:49   15    in how radiofrequency works within call detail records and

16    mapping applications that are commonly used by law

17    enforcement and criminal justice practitioners.  He had

18    access to the program and studied the program for over a

19    year and published a book about it.  I can't tell you what

11:45:06   20    his intention or how he incorporates that into his classes

21    or even if he does.

22    Q.    Well, the book wasn't about TRAX, correct?

23    A.    No.  The book is about interdisciplinary cybersecurity,

24    but more importantly mobile network forensics, is what the

11:45:22   25    book is about, which I'm going to say there is always a

1    chance I'm wrong, but if you're a Ph.D. as a professor at a

2    well known college, I don't think you're writing books about

3    mobile network forensics without being able to talk about

4    radiofrequency.  I don't think the two are going to go

11:45:37   5    together.

6    Q.    His book never describes your algorithm or breaks it

7    down, correct?

8    A.    No, it does not.

9    Q.    His book was published in 2019, correct?

11:45:49   10    A.    That is correct.

11    Q.    And he would have had access to the program you said

12    for a year, so it would have been 2018 or earlier, correct?

13    A.    Correct.  He had access to the program.  I also had

14    multiple phone calls with him.  I discussed a lot of

11:46:07   15    different information with him.  At that time, we were

16    actually supporting the update that we pushed later that

17    year externally, we actually had that algorithm developed

18    and were using it internally for further testing.  We also

19    discussed some different things about that.

11:46:23   20    Q.    But that's not the program he was using?

21    A.    Well, he was using TRAX, but he has all of the

22    underlying data about how TRAX works.  We did have very

23    specific conversations about how the ranging is used.

24    Q.    So since the software has been updated, there has not

11:46:56   25    been any scientific peer review write-ups about it?

1    A.    I think you are going to have to determine the

2    scientific peer review.  In my opinion, when you have a

3    subject matter expert in this field who does a peer review

4    of our program for court purposes, I absolutely think that

11:47:17  5    could qualify, because you have subject matter experts who

6    are going in looking at the accuracy, they are looking at

7    the corroborative data I've spoken about.  A lot of times

8    they're looking at drive test.  They write a report, and

9    there is probably even another layer of challenge for them

11:47:31 10    is that they have to present that report in a court of law

11    and make sure that they are meeting all of scientific

12    standards that have been spelled out.  And that's been done

13    probably hundreds of times at this point.

14    Q.    Let's go to Slide Number 14 in Dr. Jovanovic's Power

11:47:55 15    Point.

16    A.    Okay, I'm there.

17    Q.    Now, he testified about the location -- and really we

18    will skip ahead to Slides 15 and 16 about cell 228-501.

19    A.    Correct.

11:48:11 20    Q.    And he notes the difference in coordinates in latitude

21    and longitude.

22    A.    Well, he brings some coordinates, but you'll notice

23    that the coordinates that he brings -- I don't know where he

24    got them from.  The -- what I was explaining earlier on

11:48:32 25    direct, the screen shot on Page 15 that he is providing for

1    a cell-site list is not even the right technology for this

2    particular one.  So you're right, he does show some

3    different coordinates, but I have no idea where he pulled

4    those from or how he derived at those.

11:48:52   5    Q.    You testified earlier that it's very easy to confirm

6    the location of cell towers, correct?

7    A.    Yes, let's do that actually.  If I'm okay to publish

8    again, I can show very, very quickly how we do that.

9    Q.    I would like to look at these specifically, or you can

11:49:08   10   tell me --

11   A.    No, that's what I'll do.

12   Q.    Let me just back up, and if the government wants to do

13   that, they can.

14          Have you confirmed the location of these cell

11:49:17   15   towers?

16   A.    I have.  About 15 minutes before the hearing today is

17   the first time that I saw this particular issue with Slide

18   16, and anybody can do this.  The first thing I did is I

19   went in and I pulled the cell-site coordinates from 228-501,

11:49:33   20   which I have confirmed is in our database, it's been there

21   since 2016, we have seen it in 32 different uploads.  I put

22   those coordinates into Google Earth, and zoomed in, and sure

23   enough, there is a cell-site there.  I can go into street

24   view and see the arrangement of that cell-site.  And by

11:49:49   25   arrangement, I mean the direction the sectors are pointing,

1    and that also matches what is in our tower database.  I am

2    100 -- I am not quite there yet.

3            This is the one time I'll change my testimony where

4    I say I'm typically not going to go a hundred percent.  I'm

11:50:07  5    100 percent sure that tower 228-501 for the Verizon LTE

6    network is located exactly where we put it on Slide 17, that

7    the latitude and longitude is accurate, and that I have

8    visually actually identified that tower on the ground

9    through street view.

11:50:41  10           MR. TILTON:  May I have one moment, please, your

11   Honor?

12           THE COURT:  Yes.

13        (Pause in proceedings.)

14           MR. TILTON:  Nothing else.  Thank you.

11:50:52  15           THE COURT:  Miss Sanford.

16           MS. SANFORD:  Nothing further.  Thank you, your

17   Honor.

18           THE COURT:  All right.  Thank you.

19           Any other witnesses, Ms. Sanford.

11:51:01  20           MS. SANFORD:  No.  Thank you, your Honor.

21           THE COURT:  Mr. Tilton, any other proofs?

22           MR. TILTON:  One moment, please, your Honor.

23           (Pause in proceedings.)

24           MR. TILTON:  Your Honor, I would like to briefly

11:51:20  25   recall Dr. Jovanovic.

        1              THE COURT:  Certainly.

        2                    REDIRECT EXAMINATION

        3    BY MR. TILTON:

        4    Q.    Good morning again, Dr. Jovanovic.

11:51:36  5    A.    Good morning.

        6    Q.    You have heard Mr. Ray testify?

        7    A.    I did.

        8    Q.    And let's start with the locations and Cell

        9    Number 228-501.  Did you agree with his testimony?

11:52:02  10   A.    Did I agree what?  I didn't hear, sorry.

        11   Q.    Did you agree with his testimony?

        12   A.    Firstly, no.  Let's start first Page 15 that Excel

        13   snapshot of the cell-site table provided by Verizon with the

        14   call records file in this case.  Filtered for all cites with

11:52:38  15   Number 501, and there is no cell 501 with LT equipment by

        16   Ericsson in that cell-site.

        17              Mr. Ray testified that he actually uses some other

        18   cell-site table, which I don't know where it comes from,

        19   what is in there.  I can't review it.  What I am saying is

11:53:09  20   that he is putting LT site by Ericsson on the proper

        21   location that doesn't exist in Verizon cell-site table.  And

        22   furthermore, he is putting it at the location that's not in

        23   Verizon cell-site table.

        24              If you're uploading the cell-site tables from the

11:53:30  25   Verizon, it would be on the same location, unless there is

1    some grounding error or you change it manually.  I believe

2    that your other testimony in this case and other cases, it's

3    always emphasized that everything is done automatically

4    without any human intervention.  I cannot see how this

11:53:56    5    sector could have been as presented in TRAX without some

6    human intervention.  If there was human intervention, I

7    would expect that to be indicated somewhere to the Court.

8            And again, proprietary site table was mentioned, 32

9    times upload and stuff like that.  What is that site table,

11:54:24   10    why it wasn't disclosed?  Those are the questions I had on

11    that particular part of the testimony by Mr. Ray.

12    Q.    During Mr. Ray's testimony, he discussed the, I think

13    the currentness of your industry knowledge.  Could you --

14    A.    Okay.

11:54:50   15    Q.    Could you discuss whether your testimony is -- meets

16    current technology standards?

17    A.    First, we are talking about radiofrequency propagation,

18    which is my specialty.  We are not talking about LTE

19    radiofrequency waves propagate the same way no matter what

11:55:20   20    the technology is.  It's through what Mr. Ray said that now

21    people are putting many more cells and the coverage is

22    different and networks are more dense and all of that, but

23    that doesn't change anything in terms of the RF propagation.

24    And I am actually quite familiar with LT technology itself.

11:55:45   25    I, throughout specifications for the software simulator for

1    LTE that Verizon was using in their propagation prediction

2    tool.  I don't know I wrote the specification.  I'm not sure

3    what they did with it after that.  That was about the time I

4    was leaving Newfield, which was 2017 probably.

11:56:18  5         Can I make some comments myself.

6    Q.   Go ahead.

7         MR. McGRAW:  I mean I would object to any narrative

8    from the witness, your Honor.  There needs to be a question.

9         THE COURT:  Ask a question, Mr. Tilton.

11:56:29 10   BY MR. TILTON:

11   Q.   Dr. Jovanovic, did you find any other inaccuracies in

12   Mr. Ray's testimony?

13   A.   Okay.  I found several.  First, for the record under

14   oath, I never used a horizontal antenna pattern to depict

11:56:53 15   the coverage of the sector.  He's repeatedly stating that in

16   the Clayton case, you have the Clayton case report, please

17   find where that is, number, figure number, page number or

18   anything like that.  There is not no such utterance in the

19   Clayton report, nor in anything I have done.  In Clayton

11:57:18 20   report, there is the depiction of hand-off area which is not

21   amoeba-shaped.  It is pie based on the analysis in the

22   appendix of the angular distance, and based on the serious

23   due diligence in order to estimate most likely coverage

24   range.

11:57:45 25        TDOA, I believe that Mr. Ray is not well informed.

1    I can pull up the book or the copy of the book, electronic

2    copy of the book where he can see that if you're drawing

3    circles around a cell-site, time of arrival, time difference

4    of arrival is used in the CGMA technology where all of those

11:58:23   5    measure time differences, and then based on that network

6    based stations calculate time of arrivals for them.

7    Whenever you're drawing circles, it's time of arrival.  When

8    you use time differences to calculate time of arrivals, you

9    can draw circle, but it's still time of arrival.

11:58:54   10         I can also comment about the estimate size.  Proper

11    measure of the accuracy of the depiction cannot just take

12    the probability that you are in the area marked.  It has to

13    take into account the chance that you're showing something

14    where mobile cannot be.  Mr. Ray can achieve a hundred

11:59:31   15    percent accuracy of his estimates if he draws 100 mile

16    circle around each of his sites.  Phone is certainly going

17    to be within 100 miles.  He can go 50 miles, that would be

18    99.9.  If he drove ten miles -- just by making the estimate

19    huge, you cannot -- you increase the probability that you're

12:00:00   20    leaving the area, but you're showing meaningless results,

21    right?

22         There was also a question where he was showing how

23    the coverage in Google Earth, how the coverage to the

24    southeast of one site was related to the coverages in the

12:00:28   25    area -- to the south in the area.  I'm not sure I could

1    discern if that was the same case that I showed in Slides 9

2    and 10.  The areas were red, so it might have been Verizon,

3    I'm not sure.  But in Slides 32 through 38, you have

4    coverage areas around that site which miraculously increase

12:01:00    5    its rate range 2.5 times as related to the old neighboring

6    cells in the file that I could find.  And you will see a lot

7    of cells to the southwest, and you'll see again impossible

8    overlap in coverages.  That doesn't happen.

9         I understand Mr. Ray has spent years of experience

12:01:24    10    of finding dead bodies and stuff like that.  I have 25 years

11    experience of utilizing drive test data in all sorts of

12    capacities in crime court in Lucent, in Newfield Wireless.

13    These things that he is showing don't happen in the field

14    the way they are showing.  I have a lot of firsthand

12:01:48    15    experience with drive test measurements, with propagation

16    prediction tools, with all of that stuff.  It just doesn't

17    happen this way.

18         Again, you can show the sector, you can drew 50

19    miles around it, you can be 100 percent accurate in your

12:02:05    20    presentation, but that's misleading.

21    Q.    Thank you.

22         Do you have the affidavit from the Clayton case in

23    front of you?

24    A.    I do.

12:02:20    25    Q.    And this is Defense Exhibit OO.  And did you prepare

1    that affidavit?

2    A.   Yes, that's mine, yeah.

3           MR. TILTON:  Your Honor, I move admission of

4    Exhibit OO?

12:02:38  5           THE COURT:  Any objection?

6           MR. McGRAW:  I'm not sure what the relevance of

7    that affidavit is to this proceeding, your Honor.

8           THE COURT:  Mr. Tilton.

9           MR. TILTON:  Your Honor, Dr. Jovanovic has referred

12:02:48 10   to that affidavit.  I don't intend to ask any questions at

11   this point, but it's been referenced, I believe by Mr. Ray

12   as well, and they have talked about the Clayton case and the

13   Merritt case similar to Government Exhibit 100.  So I think

14   just for a clear record having that affidavit is part of

12:03:05 15   this record, would help clarify if there are any questions

16   somewhere down the line.

17           THE COURT:  Would help clarify what?

18           MR. TILTON:  What Dr. Jovanovic is specifically

19   talking about or testifying about.

12:03:21 20           THE COURT:  Okay.

21           I'll receive the exhibit.  Go ahead.

22           MR. TILTON:  I have no additional questions, your

23   Honor.

24           THE COURT:  Ms. Sanford or Mr. McGraw?

12:03:31 25           MR. McGRAW:  No questions, your Honor.

THE COURT:  All right.  Thank you.

Any further proofs, Mr. Tilton?

MR. TILTON:  No, your Honor, thank you.

THE COURT:  Does the government have anything else?

MS. SANFORD:  No, thank you.

THE COURT:  All right.  Thank you.

I can take argument now if you want to do oral argument at this point.  And then we will --

MS. SANFORD:  The government is prepared.

MR. TILTON:  Yes, your Honor, that's fine.

THE COURT:  Okay.

Mr. Ray and Dr. Jovanovic, you're excused with the Court's thanks.

DR. JOVANOVIC:  Thank you.

MR. RAY:  Thank you, sir.

(Zoom call disconnected.)

THE COURT:  Miss Sanford.

MS. SANFORD:  Thank you, your Honor.

The government contends that pursuant to the standards outlined under Daubert, this evidence is admissible at trial.  What Exhibit 25 shows is cell-site location information, wifi data, and RTT sometimes called TDOA data of various phones associated with this case.  And it's mapped here by TRAX.  And the TRAX software is, we contend, valid and reliable.  It uses an algorithm that was

1    very clearly outlined for the Court that's testable, that

2    has been peer reviewed, that could be replicated, and that

3    can be tested.  The accuracy of the call hand-off range data

4    can be tested against internal data such as the wifi data

12:05:20  5    and the RTT data that we find in these devices in this case

6    and they have seen in other cases, and it can be tested

7    against external data, such as drive testing.

8        I think there were two things that Dr. Jovanovic

9    said that are important to analyzing this issue.  First, he

12:05:37 10    agreed that this sort of data can be mapped.  Now, he

11    thought that it needed to consider the radiofrequency

12    pattern, the antenna height, the strength, the topography,

13    whether it's urban or rural, etcetera.  And what Mr. Ray

14    said is that although they don't specifically look at all of

12:05:54 15    those things for each cell-site in TRAX, those things are

16    accounted for by the error rate.

17        And Dr. Jovanovic said that drive test data would

18    be a good way to test the accuracy of this sort of mapping

19    program.  And TRAX uses drive test data to check against its

12:06:11 20    database to make sure that it is accurate, and they have

21    done that.  So I do think that this is sufficiently reliable

22    for the Court to admit it.

23        And it's relevant and probative here.  If we look

24    at, for instance, Government's Exhibit 25S, we are showing a

12:06:26 25    cell-site location -- cell-site location for a phone call

1    that Dan Errico is making.  This is a pretty large area

2    that's covered here.  It goes from Leonard to the north

3    almost to Wealthy to the south, it goes beyond College to

4    the west and Fuller to the east.  This covers many, many

12:06:45  5    blocks in the City of Grand Rapids.  And the government

6    isn't trying to pinpoint where anybody is inside of this

7    particular area.  But what is relevant about this exhibit is

8    in 25S we see the cell tower that Dan Errico was using to

9    make a call to a phone number that belongs to Mustafa

12:07:02  10   Reynolds.  And in 25T, we see that Mustafa Reynolds is

11   getting that call on that exact same cell tower.  We think

12   that sort of information is relevant to the jury to

13   understand and corroborate witness testimony when Dan Errico

14   says he called Mr. Reynolds and they met, and there was a

12:07:19  15   drug transaction, this is corroborating of other evidence

16   that the jury is going to hear.  It's relevant, it's

17   probative, it's valid, it's reliable, it's been peer

18   reviewed, it can be tested.  We think that Government's

19   Exhibits 25 should be admitted at trial.

12:07:35  20           Thank you.

21           THE COURT:  Mr. Tilton.

22           MR. TILTON:  Thank you, your Honor.

23           Your Honor, the defense recently filed in ECF 109,

24   a reply to both the Daubert motion and to the Rule 16

12:07:58  25   motion, and I'm going to rely largely on that, because I

think, based on the testimony here today, our arguments are
still consistent with what we made in that motion.

What I'll add today, a couple things:  Number 1,
Dr. Jovanovic is someone whose credentials are, I think,
very appropriate to review the TRAX software and make a
determination of whether or not it meets the Daubert
standard.  He is someone who has U.S. patents in hand-off
technology, which is exactly what TRAX advertises itself as
being able to do.  He has written technical papers and he
has worked -- over 30 technical papers, and he has worked in
this exact field for well over 30 years, has a Ph.D. in
engineering, and has held both leadership and development
positions in the industry.  And so I think his affidavit
speaks very loudly as to why TRAX is not reliable.  It's the
only company that uses this type of theory and it hasn't
been peer reviewed.

Mr. Ray talked about peer review in a nonscientific
sense, and in a scientific sense.  He had placed a number of
papers on his website and several individuals, including
Dr. Jovanovic, none of which support his theory or
technology.  He has listed one person both between his
testimony today and his testimony in July who he said wrote
a peer-reviewed book about the technology, a Professor
Sharevski from DePaul.  But as he testified today, that book
does not address the TRAX algorithm, and it addresses the

1    TRAX software that was used in 2019 prior to this update in

2    2020 when there were significant changes that were made.  So

3    since these significant changes that were made that have

4    supposedly increased the accuracy about 10 percent, there

12:10:34   5    hasn't been a single person who has peer reviewed that, not

6    that the government has pointed to, not that Mr. Ray has

7    pointed to.  So I think --

8         THE COURT:  Isn't the record fairly clear that the

9    updated software helps to exculpate as opposed to the other

12:10:52   10   way around?

11        MR. TILTON:  Well, it all depends on the

12   circumstances and --

13        THE COURT:  Based on the exhibit that I saw, the

14   adjustment based on the new software expanded the area where

12:11:10   15   a certain call was being made.  That doesn't help the

16   government, does it?

17        MR. TILTON:  Well, actually I think if you're

18   referring to Slides 10 and 11, it potentially could.  We are

19   talking about an area in -- an urban area in Grand Rapids.

12:11:32   20   This call from that ends, the phone number that ends 0111,

21   or a text was from one of the alleged victims in this case,

22   and so I think changing and increasing the size of where

23   that person was could be helpful, could be exculpatory, but

24   it may not be helpful to the defense.  But I think more

12:11:56   25   importantly --

1          THE COURT:  Are you suggesting the update of the

2     software which, based on the testimony, contained more

3     information, more inputs, is less accurate than the software

4     before April of 2020?

12:12:12   5          MR. TILTON:  Well, I don't think that we can -- I

6     don't think we can say that, because it hasn't been peer

7     reviewed.  There was one instance of what he is calling peer

8     review, which I don't think meets the standard of the older

9     software, and no one has peer reviewed it after April of

12:12:31  10     2020.  So I don't think that we can say.  And it's also gone

11     to a different sort of method of mapping, so I don't think

12     I'm in a position to say, and I don't know that anyone is in

13     a position to say whether it's more accurate or less

14     accurate because it's changed.  It wasn't -- didn't go

12:12:49  15     through a rigorous peer review prior to the update and, from

16     what Mr. Ray has said, it definitely hasn't since the

17     update.

18          THE COURT:  So every time there is a software

19     update, there must be a rush for a peer review article

12:13:07  20     before the software makes -- passes through the Daubert

21     test?

22          MR. TILTON:  I think that if the software changes

23     the method in which it is outputting data, then yeah.  And

24     but more importantly, I don't think that even the

12:13:26  25     pre-updated software went through rigorous peer review.  The

1    book doesn't talk about specifically the algorithm here,

2    it's a short section in a long book about a lot of different

3    products.

4        THE COURT:  All right.  Go ahead.

12:13:43   5        MR. TILTON:  And I think also looking at the

6    background of Mr. Ray and Dr. Jovanovic, Mr. Ray isn't

7    someone -- he has maybe job experience, but he doesn't have

8    any advanced degree, he doesn't have a Bachelor's, he

9    doesn't have a Ph.D.

12:14:03   10       THE COURT:  Mr. Ray and Dr. Jovanovic are both

11   imminently qualified.  I'm not going to accept an argument

12   that Mr. Ray is not qualified.  So go ahead, you can -- I'll

13   cut that one short right away.

14       MR. TILTON:  Well, I think then we look at the

12:14:19   15   known error rate.  And again, that error rate hasn't been

16   tested, hasn't been peer reviewed.  It was unclear to me

17   what the error rate was prior to the software update.  And

18   while he is saying it's a 95 percent rate nationally, there

19   is nothing -- he didn't give a specific as far as what the

12:14:42   20   accuracy rate would be in this instance where there wasn't

21   corroboration.

22       THE COURT:  I don't have a counter number, though,

23   correct?

24       MR. TILTON:  You don't have a counter number, and I

12:14:54   25   think that goes, it circles back to the peer review -- to

the peer review part of this where, if it hasn't been
reviewed, if the scientific -- larger scientific community
hasn't looked at it, it's difficult to know how accurate it
is.

12:15:09    THE COURT:  Based on the 95 to 98 percent number,
do you think -- which is the only number I have in this
record, does that meet the Gissantaner test on reliability?

MR. TILTON:  Well, I think it would actually have
to be proven.  And what Dr. Jovanovic said is it's not
12:15:32 correct, and he doesn't believe it would be anywhere near
that rate.

THE COURT:  All right.  But what am I left with
with Dr. Jovanovic's testimony regarding reliability?  I
have an assertion that 95 to 98 is not accurate.  But it
12:15:50 could be 93, based on what I heard from Dr. Jovanovic, it
could be 10, but aren't I left to guess based on this
record?

MR. TILTON:  Well, I think just because Mr. Ray
comes in and says it's 95 to 98 percent, but doesn't provide
12:16:08 any backup data or studies to say this is correct.  He
didn't provide any internal studies.  He's talked a lot
about different drive tests that they have done.  He's
talked a lot about their own internal data.  I think
largely, and he didn't delineate what that looked like
12:16:27 before April 2020 and what it looks like since, after April

1    2020, but he didn't even provide external statistics to say

2    this is how he got it.  What I heard was anecdotal.  We have

3    done a lot of testing, we have done a lot of drive testing,

4    but we haven't actually seen the numerical support for what

12:16:46  5    he is saying, whether internally or externally through some

6    sort of peer review.  I think there are a lot of open

7    questions as to how reliable is this.  Is it five percent,

8    is it zero percent, is it 90-something percent, but that

9    burden is on the government to show that it meets the

12:17:05  10   Daubert test, and I don't think that it's gotten through

11   that gate.

12          THE COURT:  All right.  I understand the argument.

13   Go ahead.

14          MR. TILTON:  May I have one moment, please, your

12:17:34  15   Honor?

16          THE COURT:  Sure.

17       (Pause in proceedings.)

18          MR. TILTON:  Your Honor, I just want to point out

19   as far as this accuracy rate, I mean part of this is how are

12:18:18  20   we able to confirm it.  And this kind of goes back to our --

21   I don't know if the Court wants me to address the Rule 16

22   motion as well at this point, but I think it does kind of

23   dovetail into that in that if there's an expectation that we

24   should provide some sort of accuracy rate and do our own

12:18:38  25   testing.  Part of that is the government has to provide us

with that information.  And so we have had, we have had the

KMZ files now for about a month, but at the same time, I

don't think that's enough time to go out and validate this

software that they intend to use at trial.  So I think

12:19:00    that -- and we have had even, you know, less time with the

updated KMZ files that were run through the April 2020

updates, we have had those for less than a month.  And so I

think if we are looking at how much time do we have or what

can we come to present as far as an accuracy rate, we just,

12:19:21    you know, Dr. Jovanovic thought it might take him a year,

but we haven't even had these files really for longer than a

month at the most.

THE COURT:  All right.  Fair enough.  I understand.

What is the remedy for that?

12:19:40    MR. TILTON:  Well, I think if the Court's going to

look at -- I guess there are couple remedies.  One is just

to exclude, because we have had, you know, here we are, when

we came in on July 23rd, the trial had already been delayed

because the government notified us the day before the final

12:20:03    pretrial or night before the final pretrial that Detective

Heikkila was an expert, and provided us with some of the

maps produced by TRAX.  But now, you know, we are at this

point here where we have received in the last month or so

100,000 data point that have gone through TRAX.  And so I

12:20:24    think at this point, I mean the Court's remedies are, you

know, do we get more time if the Court's going to rely on

the accuracy rate to try to come up with our own accuracy

rate, which I think would take a significant amount of time,

or as a remedy to exclude it.  And it's not -- again, it's

not let's go back to the same point, but since it's not peer

reviewed, we have to take Sy Ray's word for the accuracy

number at this point.  And to go out and do our own for

testing or attempt to do our own testing would, I think,

take significant time.

THE COURT:  Well, you've had two opportunities to

cross examine Mr. Ray on his accuracy rate estimates, and

I've heard multiple answers from Mr. Ray regarding your

cross examination on that issue, and that's what I have in

the record.  There is no contrary number in the record that

would undermine that estimate is there.

MR. TILTON:  Well, there is not a number

specifically, but there is Dr. Jovanovic, both his affidavit

and testimony, to say that it's not reliable.  And I think

in response to Mr. McGraw's question about determining

accuracy, he said it would take about a year to do that.

I mean I don't think it's a small task when Mr. Ray

is talking about tens of millions of data points that they

have supposedly gone through and used to validate their

program, but we just don't have it.  And as far as I know,

no one in the broader scientific community has been provided

1    with it or has done a comprehensive peer review.  And even

2    to say that Dr. Sharevski reviewed it and put it in his

3    book, there is nothing in that book to suggest he broke the

4    algorithm down and peer reviewed it in the scientific way

12:22:35    5    that I think Gissantner contemplates.

6            THE COURT:  Did I hear Dr. Sharevski's name for the

7    first time this morning?

8            MR. TILTON:  He was mentioned during the last

9    hearing.

12:22:47    10            THE COURT:  Okay.

11            MR. TILTON:  And I did reach out to him on multiple

12    occasions by email, and I called him as well to ask his

13    position, and I never received a response.

14            THE COURT:  Is the --  Is the applicable piece of

12:23:04    15    the book in the record here?

16            MS. SANFORD:  It is not, your Honor.  We do not

17    have a copy of that.

18            MR. TILTON:  We have the book.  We could -- and I

19    actually I think we have that -- it's only a couple pages, I

12:23:18    20    think we have it scanned, so we could provide it, we could

21    file it or however the Court wants to provide it.

22            THE COURT:  I take your point about peer review,

23    and we have talked peer review a lot.  Mr. Ray talks about

24    Dr. Sharevski's -- I'm sure I'm butchering the name, but

12:23:33    25    about his review.  And I think I need to read that in order

1    to come to some conclusion about the peer review prong of

2    the test that Judge Sutton gave me in Gissantner, so if you

3    could provide that to the government and send a copy to me,

4    I would appreciate it.

12:23:51    5         MR. TILTON:  Yes, your Honor.

6              And your Honor, I guess I wanted to bring up one

7    additional piece of information by proffer, especially if we

8    are going to file something, because it's likely to be filed

9    in a separate case.  I can give you, the Court, that case

12:24:08   10   number, but in what I do think is important to at least

11   bring up at this point is -- so we are talking here about a

12   closed, what I would call the closed cell horizontal plane,

13   so to define area where a cell phone is supposedly in

14   relation to a cell tower.  And that is -- the government's

12:24:28   15   using that theory in this case.  In a separate case in the

16   same district, I think it's important to note that the

17   government recently withdrew Detective Heikkila and the TRAX

18   program as an expert and notified that it would be using a

19   separate FBI's expert and the FBI cast program and using the

12:24:49   20   wedge theory.  So I think with two different cases at the --

21   pending at the same time, the second one is set for trial in

22   October in front of Judge Jarbou, the government, same U.S.

23   Attorney's Office is essentially pushing two different cell

24   phone mapping theories that I do think contradict each

12:25:09   25   other.  And if we are going to file anything additional, I

would potentially add that to the filing.

THE COURT:  Okay.  Go ahead.

MR. TILTON:  And that's really all I have on the Daubert at this point, your Honor.

THE COURT:  All right.  Thank you.

Mr. Tilton, couple more questions.  Implicitly, given the fact that you've made reference to the fact that you've only had certain pieces of the data for a limited period of time, what is the -- are you asking for more time.

MR. TILTON:  Well, your Honor, I think if -- I guess that is sort of a two-part question.  If the Court --

THE COURT:  I didn't think it was a two-part question, but go ahead.

MR. TILTON:  Two-part answer, I should say.

If the Court is contemplating allowing the TRAX software to come in and to be used by the government, I think that the difficulty that we are having is we have had a time to review the first 50,000 data points.  We have received a second 50,000 which the government provided after running the program through TRAX again.  And so I would likely want -- I would want some more time to compare those two together.  I mean I was able to quickly find that difference in horizontal plane or amoeba size from the 20th that Dr. Jovanovic used in his Power Point, but I don't know how many more are out there and how many would change

1    positions.

2           THE COURT:  You've seen 50,000, but you're looking

3    at another 50,000 that you haven't had a chance to analyze;

4    is that what I hear you saying?

12:27:10  5           MR. TILTON:  I think in relation to each other.  I

6    think now, having some, having an opportunity to work

7    through TRAX, I don't know that we need as much time as I

8    originally thought when I first received 50,000 data points,

9    but it is --

12:27:27  10          THE COURT:  You mean you didn't sit down with

11   pencil and paper and work it out?

12          MR. TILTON:  It caused my computer to crash a

13   number of times.

14          If the Court is contemplating going down that road

12:27:38  15   or would want supplemental briefing on this issue, then we

16   would want additional time prior to starting trial on

17   Monday.

18          THE COURT:  All right.  Well, what do you make of

19   the fact that, based on Mr. Ray's testimony, no attack on

12:27:56  20   this software has been successful in terms of a court

21   barring, barring its use, and specifically the Clayton case

22   where apparently the doctor's opinions were before the Court

23   and the State -- the highest State Appellate Court of New

24   York said the trial judge got it right when he allowed the

12:28:28  25   evidence in?  What do you make of the New York case where

1     Dr. Jovanovic's documentation was in the record; and

2     secondly, Mr. Ray's testimony that there hasn't been a Court

3     that's disallowed it?

4          MR. TILTON:  Well, I think there is a couple -- let

12:28:52  5     me start with the Clayton case.  It's my understanding that

6     Dr. Jovanovic came in after the trial when it was going

7     through some sort of appeal stage.

8          THE COURT:  Okay.

9          MR. TILTON:  So it wasn't through a Daubert or Frye

12:29:05  10    hearing.

11         THE COURT:  So Dr. Jovanovic's opinion was not

12    before the trial judge?

13         MR. TILTON:  Correct.  That's my understanding.

14         THE COURT:  And he came in during the appellate

12:29:17  15    process and apparently provided some information that got

16    into the record that the Appellate Courts of the State of

17    New York reviewed?

18         MR. TILTON:  Correct.

19         THE COURT:  Okay.

12:29:26  20    MR. TILTON:  And he never --

21         THE COURT:  Thank you for that clarification.  I

22    didn't realize that.

23         MR. TILTON:  So he never testified.

24         You know, it's I think, and we do -- we did cite in

12:29:36  25    our brief a case out of Massachusetts.  It's on Page 17, the

1    Commonwealth vs. Carrasquillo, and I think I said that

2    wrong.  It's C-a-r-r-a-s-q-u-i-l-l-o.  There was a Daubert

3    hearing, pretty significant Daubert hearing, as I understand

4    it, that lasted more than one day, and in that case, the

12:30:03  5    judge disallowed the information.

6            THE COURT:  All right.  I've read that opinion, and

7    it would appear to the Court that the prosecuting authority

8    did a lousy job presenting their case, and that was my --

9    that was my bottom line, because the opinion continues to

12:30:24  10    cite absences in the record which, you know, looked curable

11    to me based on my read.  Now, that's all I've done is I've

12    just read the appellate opinion, but that was the conclusion

13    I came back with.

14            MR. TILTON:  Well, I think that sort of goes to, at

12:30:45  15    least my interpretation of, on the defense side or with some

16    sort of level of experts as far as why this information is

17    often not challenged.  Because I think that when you put --

18    I think the thing that this TRAX software, I think, really

19    has going for it is it's very user friendly.  And you upload

12:31:10  20    all of the CDRs and it spits out these maps within about ten

21    minutes.  And I think -- my interpretation in talking to

22    different sort of digital forensic experts is that the cell

23    tower sort of analysis is such a higher level that there are

24    fewer people who are qualified.  And I talked to several

12:31:34  25    people about this program and they liked the simplicity of

1    it.  And I think that it looks, I think, more accurate than

2    I think it is until you talk to someone who has a background

3    in radiofrequency and cellular geolocations like

4    Dr. Jovanovic.  And that was when I talked to a couple

12:32:03  5    different people who provide services on things like

6    Cellebrite.  This was above and beyond them, and so I think

7    that is the initial problem that I had when this was, when

8    the TRAX program was brought to me, is there is not a lot of

9    familiarity with it, and some people look at it and think

12:32:23  10   well, it's simplifies a very difficult area and it must be

11   accurate.  But that ultimately, when I talked to

12   Dr. Jovanovic who has experience, who has experience in this

13   very specific field, he -- and I talked to several other

14   attorneys who had challenged or were in the process of

12:32:45  15   challenging this information, I got a much better

16   understanding of it, and I think that it doesn't get

17   challenged because people don't necessarily understand it

18   all that well.

19          THE COURT:  Federal defenders across the country

12:33:01  20   don't understand it?

21          MR. TILTON:  It was also hard.  We sent out an

22   email to our federal defender help desk.

23          THE COURT:  An E blast?

24          MR. TILTON:  Yes, and we received very limited

12:33:13  25   information about the use of this in other cases.  That's

1      not to say that it's not being used, but we received very

2      little feedback that people were not familiar with it.  I

3      also sent it to our panel on the local bar and asked people

4      if they were familiar with this program, and there was very

12:33:32   5      limited familiarity with it.  So I think that's part of it

6      as well.  It's a newer program.

7              THE COURT:  All right.  Thank you.  Did you have

8      anything else at the moment, Mr. Tilton?  I'll come back to

9      you if you want.

12:33:43  10              MR. TILTON:  Not at the moment, your Honor.  Thank

11      you.

12              THE COURT:  Thank you.

13              Ms. Sanford.

14              MS. SANFORD:  Thank you, your Honor.

12:33:48  15              THE COURT:  What result from the use of the TRAX

16      software do you intend to introduce, if allowed?  Are we

17      talking about the post 4-20 software result, or the

18      pre-April '20 software.

19              MS. SANFORD:  We are talking about introducing maps

12:34:11  20      generated after the software update that show general

21      locations where cell phone might be based on cell-site

22      location information.  And I wanted to highlight for the

23      Court the Hill case out of the Seventh Circuit, 18 F.3rd

24      289, which says that historical cell-site analysis can show

12:34:36  25      with sufficient reliability that a phone was in a general

1    area, especially a well-populated one, and that's all we are

2    trying to do here.

3            And that Court went on to point out that although

4    there is not a mathematical error rate, the technique has

12:34:47   5    been subjected to publication and peer criticism, if not

6    peer review.

7            We aren't trying to say, and I think a lot of the

8    cases critical of cell-site location information are the

9    idea we are trying to say someone is in a precise location

12:35:02  10    based on a tower they are hitting off of.  We aren't saying

11    that.  But we are saying there are important correlations

12    for instance, that when Mr. Errico and the defendant are on

13    the phone with each other, they are both hitting on the same

14    tower that covers the same part of the city, but that's

12:35:15  15    important to corroborate what some of our witnesses will

16    testify to.  But we are never going to use cell-site

17    location information to exactly pinpoint anyone's location.

18            I listed a number of cases in our response that,

19    from various circuits admitting this kind of evidence.  And

12:35:34  20    I think that there are multiple ways this could be mapped.

21    It could be mapped the way TRAX does it with a horizontal

22    plane.  It could be mapped with a cone shape, as has been

23    done in other cases, but the fact that someone could map it

24    differently or someone could draw different conclusions

12:35:50  25    about what the coverage area is for a cell-site goes to the

1   weight of the evidence, not the admissibility.  That's

2   subject to cross.  They can produce their own witnesses, say

3   they would draw different conclusions.  I don't think it

4   prevents this evidence from coming in because it could be

12:36:03   5   done differently or because they disagree with the

6   conclusions our experts reach.

7           THE COURT:  What is your reaction to Mr. Tilton's

8   request for more time?

9           MS. SANFORD:  The government would very much like

12:36:16   10   the case to proceed next week.  We have provided all of the

11   data points they have had throughout.  I know he is talking

12   about 50,000 data points before and 50,000 data points since

13   the software update, but that's three months of data for

14   cell phones, the two decedents, the defendant and

12:36:34   15   Mr. Errico.  And three months of data isn't necessarily

16   relevant to this case.  What is relevant to this case is a

17   much shorter time span of about the day when these drugs

18   deals occurred, and really the 12 hours.  And we have

19   provided a copy of our Exhibit 25, both with the mapping

12:36:47   20   done before software update and after, and the only change

21   in anything that we would show the jury is the one change

22   that's already been pointed out, Slides 10 and 11 in

23   Dr. Jovanovic's presentation.

24           THE COURT:  That is the only change?

12:37:01   25           MS. SANFORD:  That is the only cell-site location

1      -- cell-site that changed in the exhibits that we will use.

2              THE COURT:  And it got broader?

3              MS. SANFORD:  Yes.

4              THE COURT:  And help me with the relevance of those

12:37:14   5      two slides.

6              MS. SANFORD:  Those are calls that one of the

7      decedents, B.D., made, and so it shows roughly where he was

8      while he was making those calls.

9              THE COURT:  To?

12:37:28  10             MS. SANFORD:  I think it was Dan Errico, who acted

11     as a middleman in obtaining the heroin/fentanyl for him.

12             THE COURT:  All right.  So it was only that one?

13             MS. SANFORD:  That was the only change in the map.

14             THE COURT:  The only change?

12:37:43  15             MS. SANFORD:  Yes.

16             THE COURT:  Okay.  All right.  Thank you.

17             Go ahead, Mr. Tilton.

18             From your review so far, did you see any other

19     changes?  I mean the government apparently is going to go

12:37:59  20     with the updated software.  Did you see any other changes

21     other than the ones that -- other than the one Ms. Sanford

22     just referred to?

23             MR. TILTON:  So I have so far not seen any more,

24     but I haven't -- so with each device, they are, I don't know

12:38:18  25     if you recall, I think we went through them a little bit on

            the 23rd.  There's a different file that's created for,

            generally I think it's at least three per phone, so it will

            be calls, it will be texts, and it will be data.  And so

            there can -- I can't say for certain that we are not going

12:38:41    to find more on the 20th, more variations.  I mean I think

            any communication between Dan Errico and either of the

            decedents is, the night of the 20th, is a very important

            communication, especially because I think the government's

            case is going to be that Dan Errico gave B.D. the substances

12:39:10    that killed him.  That, you know, the government's case will

            be they came from Mr. Reynolds, so it's a significant

            communication anytime there is that kind of contact, and

            really any contact or location that night, I think, is very

            important.

12:39:25        What I just --  The other thing I wanted to briefly

            point out is there are different types -- when Ms. Sanford

            was talking about <u>Hill</u> and different types of cell phone

            evidence that's been allowed in in different courts, I do

            think it's important to talk about -- a little bit about the

12:39:43    different pies and wedges, and in this case the horizontal

            plane.  And the reason is because when Dr. Jovanovic talks

            about sort of the pie, the triangle that shoots off of the

            cell tower, it's my understanding he is talking about an

            undefined sort of top of the piece of that pie.  So it kind

12:40:02    of shoots out until the antenna loses its radiofrequency.

1    There have been some courts that have looked at sort of a

2    cap on that pie, and that would be closer to what we are

3    talking about here, which defines the area more small -- in

4    a smaller sense than that open cone or wedge shape.

12:40:28   5           So I think when we look at the overall caselaw,

6    it's important to focus on cases where the area is more

7    defined as opposed to sort of just cell-site location in a

8    broader sense.

9           THE COURT:  Okay.  Mr. Tilton, let me ask another

12:40:51   10   question.  I'm not going to hold this to you, but it's a

11   concern that I have in terms of a presentation of this case

12   to the jury.  It was very difficult to hear Dr. Jovanovic

13   via the ZOOM, and I assume the court reporter was having a

14   little bit of trouble, too.  I'm a little bit concerned, if

12:41:18   15   you are going to call him, whether his testimony is

16   appropriate given the technology issues and the ZOOM

17   connection there, I don't know if it was above average or

18   average or better than average, but it wasn't working for me

19   all the time in terms of some of the time when the voice got

12:41:47   20   little bit lower, it was harder to pick up, so do you have

21   any notion about, on that subject?

22           MR. TILTON:  Subject to the approval of funding, it

23   would be my intent to call him, if we decide to call him, to

24   testify in person.  And he lives in Indiana, so I think that

12:42:07   25   we could make that.

```
 1              THE COURT:  I thought he was in the State of

 2    Washington.  I saw some reference to the State of

 3    Washington.

 4              MR. TILTON:  He did live there and he worked there.

 5    Now at least when I've talked to him --

 6              THE COURT:  When I read that, I said have we got

 7    this witness up at 6:00 a.m. in the morning to testify?

 8              MR. TILTON:  Right now he is in Indiana.

 9              THE COURT:  His local time to testify.  Okay.  So

10    he is in Indiana.

11              MR. TILTON:  Yes.

12              THE COURT:  Okay.  All right.  So his physical

13    availability is not going to be an issue.

14              MR. TILTON:  I don't think so.

15              THE COURT:  As far as you know.

16              MR. TILTON:  Right.

17              THE COURT:  Fair enough.  All right.  Here is what

18    I want to do.  Obviously I got a lot of new information

19    today, so I'm going to give everybody the opportunity to

20    submit post-hearing briefs, if they want.  Please limit to

21    12 to 15 pages.

22              And Mr. Tilton, I've heard your request for an

23    adjournment of the trial, but if you -- if that's still your

24    position, assuming, obviously assuming the Court's going to

25    allow this evidence in, and I appreciate the fact you are
```

12:42:17    5
12:42:30   10
12:42:37   15
12:42:50   20
12:43:16   25

1    not sure about that, but if you would address your request

2    for a delay in the trial in your papers, and that way I can

3    evaluate that.  Obviously if I'm not going to allow the

4    evidence in, then that becomes moot.  But if I am going to

12:43:38    5    allow the evidence in, I want you, if you would, to address

6    your request for an adjournment and why you need one, okay?

7            MR. TILTON:  Thank you, your Honor.

8            THE COURT:  All right.

9            Anything else from the government?

12:43:48   10            MS. SANFORD:  No.  Thank you, your Honor.

11            THE COURT:  Mr. Tilton?

12            MR. TILTON:  I guess just as far as when we submit

13    the -- obviously we are scheduled for trial Monday.  Is

14    there a certain time you want that?

12:44:02   15            THE COURT:  I would say first thing in the morning

16    Thursday or last thing of the day on Wednesday, either one.

17    I've got a jury -- jurors, the jury is going to be calling

18    in.  When are we scheduled to start, Monday?

19            COURT CLERK:  Yes.

12:44:19   20            THE COURT:  So the jury starts to call in several

21    days in advance and the jury clerk likes to give them

22    guidance, so first thing in the morning Thursday at the

23    outside.

24            MR. TILTON:  Thank you, your Honor.

12:44:32   25            THE COURT:  Okay.  All right.  Thanks very much.

1          COURT CLERK:  All rise, please.

2          THE COURT:  You can be seated.

3       (At 12:44 p.m., proceedings concluded.)

1

2

3

4                    C E R T I F I C A T E

5

6          I, Kathleen S. Thomas, Official Court Reporter for the

7    United States District Court for the Western District of

8    Michigan, appointed pursuant to the provisions of Title 28,

9    United States Code, Section 753, do hereby certify that the

10   foregoing is a true and correct transcript of proceedings

11   had in the within-entitled and numbered cause on the date

12   hereinbefore set forth; and I do further certify that the

13   foregoing transcript has been prepared by me or under my

14   direction.

15

16

17                        /s/

18                        _____

19                        Kathleen S. Thomas, CSR-1300, RPR
                           U.S. District Court Reporter

20                        410 West Michigan
                           Kalamazoo, Michigan   49007

21

22

23

24

25